Hat, Judge,
delivered the opinion of the court:
This is a petition brought by the Morrisdale Coal Co., a corporation of the State of Pennsylvania, to recover from the United States the sum of $15,337.37. To this petition of the plaintiff the defendants have demurred.
The plaintiff alleges in its petition that it was during the times mentioned therein engaged in the business of mining and shipping Morrisdale and Cunard bituminous coals, having its principal place of business in the city of Philadelphia ; that the President of the United States, by virtue of the act of Congress approved August 10, 1917, did, on August 23, 1917, by Executive order, appoint Harry A. Garfield Fuel Administrator and delegate to him such powers and authority as had been invested in the President by the act aforesaid in so far as the same were applicable to fuel; that prior to August 23,1917, the plaintiff had entered into bona fide contracts for the supply of coal to buyers, the requirements of such contracts aggregating the plaintiff’s entire output; that more than 90 per cent of the business of the plaintiff consisted in furnishing all the necessary bunker coals required by the buyers for definite periods of time for the use of all steamers at certain specified ports; that during the period June to November, 1918, the total amount of coal called for under the contracts then in existence between the plaintiff and the buyers was 160,354.65 tons, with certain monthly requirements. It is further alleged that during the period June to November, 1918, the quantity of coal mined and shipped by the plaintiff totaled 112,756 tons, which was 47,598.65 tons less than the quantity contracted for the period of June to November, 1918; that during the period aforesaid the Federal Fuel Administration requisitioned and compelled plaintiff to divert 12,823.89 tons of coal. It is further alleged in said petition that the price received by the *312 plaintiff for the coal so requisitioned or diverted was $3,304 per gross ton, whereas the price stated in the contracts under which this coal had been previously sold was $4.50 per gross ton. The petition further alleges that upon each ton of coal requisitioned or diverted by the Fuel Administration the plaintiff suffered the loss of $1,196, and upon the whole quantity requisitioned or diverted its loss amounted to $15,-337.37, for which amount it sues.
The plaintiff in bringing its action relies for relief upon the provisions of the act of August 10,1917, and in its brief filed in this cause relies further upon the provisions of the fifth amendment to the Constitution.
The sections of the act of August 10,1917, which deal with the requisitioning and diversion of fuel are sections 10 and 25, 40 Stat., 279, 284.
Section 10 provides—
“ That the President is authorized, from time to time, to requisition foods, feeds, fuel, and other supplies necessary to the support of the Army or the maintenance of the Navy, or any other public use connected with the common defense, and he shall ascertain and pay a just compensation therefor. * * * If the compensation so determined be not satisfactory to the person entitled to receive the same, such person shall be paid seventy-five per centum of the amount so determined by the President, and shall be entitled to sue the United States to recover such further sums as, added to said seventy-five per centum, will make up such amount as will be just compensation * * *.”
In pursuance of the provisions of the act of August 10, 1917, the President, on March 15, 1918, issued a proclamation, appointing Harry A. Garfield Fuel Administrator, and delegated to him the powers which were conferred upon the President by the act aforesaid (40 Stat., 1757).
The petition in this case does not allege that the coal was requisitioned by the President or by the Fuel Administration for public use, nor that the compensation which it received was ascertained by the President or the Fuel Administration, nor that the compensation was unjust, nor that the plaintiff was not satisfied with the compensation it received, nor does the petition allege from whom the compensation was received. We therefore conclude that the petition does not show a cause of action under section 10 of the act.
*313 Section 25 of the act of August 10, 1917, deals entirely with the subject matter of fuel, and provides—
“ That the President of the United States shall be, and he is hereby, authorized and empowered, whenever and wherever in his judgment necessary for the efficient prosecution of the war, to fix the price of coal and coke, whenever and wherever sold, either by producer or dealer, to establish rules for the regulation of and to regulate the method of production, sale, shipment, distribution, apportionment, or storage thereof among dealers and consumers, domestic or foreign.”
It is further provided that if any producer or dealer fails or neglects to conform to such prices and regulations the President is authorized to take over the plant or business of such producer or dealer and to operate the same, and provision is made.for the conduct of the business so taken over by the President. (40 Stat., 284, 285.) There is nowhere in this section or in the statute any provision made for suits by individuals or corporations against the United States in cases where the President or the Fuel Administration in the exercise of the powers conferred by the statute diverts coal among dealers and consumers, and thereby incidentally causes the dealer to receive less for his product than he might have received had he been allowed to distribute his product in accordance with his own plans and methods.
The plaintiff, however, seems to rely upon the following provision of the statute:
“ The maximum prices so fixed and published shall not be construed as invalidating any contract in which prices are fixed, made in good faith, prior to the establishment and publication of maximum prices by the commission.” 40 Stat., 286.
The plaintiff construes this provision to mean that whenever the President or the Fuel Administration, in the exercise of the powers conferred upon them by the statute, diverts coal from one consumer to another, and the dealer has a contract made in good faith with the consumer from whom the coal is diverted at a price higher than that received by him from the consumer to whom the coal is diverted, then the United States must pay the difference in price to the dealer. We do not think that is the meaning of the provisions of the *314 act. What is meant is that as between the parties to a contract made in good faith prior to the establishment and publication of a maximum price, neither party can substitute the price fixed and published by the Government in place of the price fixed by the contract.
We conclude, therefore, that there is nothing in section 25 of the act which, under the allegations of the petition, gives to the plaintiff a right of recovery.
This brings us to consider whether or not the plaintiff has a right of action under the fifth amendment to the Constitution. Have the defendants by diverting the coal of the plaintiff from the consumers with whom it had a contract to consumers with whom it had no contract, thereby causing the plaintiff to lose a part of its contract price, taken the property of the plaintiff for public use without just compensation ?
The act of August 10,1917, reads as follows:
“ That by reason of the existence of a state of war, it is essential to the national security and defense, for the successful prosecution of the war, and for the support and maintenance of the Army and Navy, to assure an adequate supply and equitable distribution, and to facilitate the movement of foods, feeds, fuel, including fuel oil and natural gas, and fertilizer and fertilizer ingredients, tools, utensils, implements, machinery, and equipment required for the actual production of foods, feeds, and fuel, hereafter in this act called necessaries; to prevent, locally, or generally, scarcity, monopolization, hoarding, injurious speculation, manipulations, and private controls, affecting such supply, distribution, and movement; and to establish and maintain.governmental control of such necessaries during the war. For such purposes the instrumentalities, means, methods, powers, authorities, duties, obligations, and prohibitions hereinafter set forth are created, established, conferred, and prescribed. The President is authorized to make such regulations and to issue such orders as are essential effectively to carry out the provisions of this act.” 40 Stat., 276.
The Constitution confers upon Congress the power to declare war, and confers upon it power to make all laws necessary and proper to carry into effect the granted powers, which must of necessity include the power to adopt and provide for all necessary means to enable the Government to *315 conduct the war to a successful issue. This power is essential, not only for the purpose of defeating the enemy by supporting and maintaining the Army and Navy but also to provide for the general welfare, and to insure the prosperity of the country and of the people during the progress of the war.
The statute under discussion, among other things, provides that the President shall have power to distribute coal among dealers and consumers, and in order to exercise that power it became necessary for him to adopt regulations as to the means of distribution and to impose upon dealers the duty of distributing coal to consumers in such a manner as to provide for and preserve the industries of the country, as well as to provide for the health and welfare of the people at large by furnishing them with fuel. If in carrying' out these powers some dealer was deprived of a price for his coal which he had contracted for, does that impose upon the Government an obligation to pay the difference in the price contracted for and the price obtained from the person to whom the President directed him to deliver the coal? Is such an act done by the President in the exercise of the war powers conferred upon him by Congress a taking of property within the meaning of the fifth amendment of the Constitution ? The power of the Government in time of war to impose conditions and restrictions upon industries and to regulate the conduct of its citizens is undoubted. It is a power which belongs to the Government as incident to the power to declare war and to carry it on to a successful termination. The regulations made by the President under the authority of the statute are simply the exercise of that war power; and if the statute is an exercise of the war powers of the Government, it is not affected by the restrictions imposed by the fifth amendment of the Constitution. Miller v. United States, 11 Wall., 268; Hamilton v. Dillin, 21 Wall., 73. That the statute was a legitimate exercise of the war power can not be successfully questioned! Not only under the war power, but under the power of Government inherent in every sovereignty, “the Government regulates the conduct of its citizens one toward another, and the manner in which each shall use his own property, when such regula- *316 fcion becomes necessary for the public good.” Munn v. Illinois,, 94 U. S., 113, 125. “ Property does become clothed with a public interest when used in a manner to make it of public consequence and affect the community at large. Where, therefore, one devotes his property to a use in which the public has an interest he, in effect, grants to the public an interest in that use and must submit to be controlled by the public for the common good to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but so long as he maintains the use he must submit to the control.” Munn v. Illinois, supra, p. 126.
Certain the business of mining and shipping coal is one in which the public has an interest at all times. But in time of war it becomes a business which is vital not only to the interest of the general public, but to the very existence of the Government itself and to the agencies which the Government must use for the successful termination of the war in which it is engaged. Moreover, the statute under discussion gave to the dealer in coal who was not satisfied with the regulations prescribed by the President the privilege of giving up his business, in which event the Government would have taken it over, and would have paid him for it, and if he was not satisfied with the valuation placed upon it by the Government he was given the further privilege of suing the United States for its value in the courts.
It has been repeatedly held by the Supreme Court of the United States that when governmental powers are legitimately exercised for the public good, and the injury complained of is only incidental to their exercise, there is no taking of property for the public use. C., B. & Q, Ry. v. Drainage Commissioners, 200 U. S., 593, where it-is said by the court: “ If the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good, then there is no taking of property for the public use, and a right to compensation, on account of such injury, does not attach under the Constitution.”
“ The requirement that compensation be made for private property taken for public use imposes no restriction upon the inherent power of the State by reasonable regulations to protect the lives and secure the safety of the people.” *317 Chicago, Burlington & Quincy R. R. Co. v. Chicago, 166 U. S., 226, 252. See also New York & New England R. R. Co. v. Bristol, 151 U. S., 556, 567.
In exercising tbe war powers conferred upon it by tire Constitution, Congress has legitimately exercised them in the act of August 10,1917, and having legitimately exercised them, the injury to the plaintiff, if injury there be, is only incidental to their exercise, and there has been no taking of its property for public use, and it is not entitled to compensation.
For the reasons given, the demurrer of the defendants to the petition of the plaintiff is sustained. The petition will be dismissed with leave to the plaintiff to amend the same within 30 days if it so desires.
Graham, Judge; Dowhey, Judge; Booth, Judge; and Campbell, Chief Justice, concur.