## UNITED STATES $v$. CARVER ET AL.

No. 78. Argued November 28, 1928.—Decided January 2, 1929.

Solicitor General *Mitchell*, with whom *Assistant Attorney General Galloway* and *Mr. J. Frank Staley* were on the brief, for the United States.

*Mr. Frank E. Scott* for respondents.

Mr. Justice Sanford delivered the opinion of the Court.

Carver and others, citizens of the United States, who were at the times hereinafter mentioned, the owners of the vessel *Betsy Ross,* in 1923 brought this suit against the United States in the Court of Claims. Their petition—which was based on the Emergency Shipping Fund section of the Act of June 15, 1917, 40 Stat. 182, c. 29—alleged that in 1918 the United States Shipping Board, on behalf of the Government, made use of, requisitioned or took over the vessel from their service and business, for the use of the United States Grain Corporation in the transportation of wheat; and that " by reason of being deprived of the use of· said ship " they were entitled to compensation. The court, upon its findings of fact, awarded them judgment. 64 C. Cls. 1.

The Act of 1917 provided: " The President is hereby authorized and empowered within the limits of the amounts herein authorized—(a) To place an order with any person for such ships or material as the necessities of the Government, to be determined by the President, may require during the period of the war and which are of the nature, kind and quantity usually produced or capable of being produced by such person.  (b) To modify, suspend, cancel, or requisition any existing or future contract for the building, production, or purchase of ships or material. . . .  (e) To purchase, requisition, or take over the title to, or the possession of, for use or operation by the United States any ship now constructed or in the process of construction or hereafter constructed, or any part thereof, or charter of such ship.  Compliance with all orders issued hereunder shall be obligatory on any person to whom such order is given, and such order shall take precedence over all other orders and contracts placed with such person.

. . . Whenever the United States shall cancel, modify, suspend or requisition any contract, make use of, assume, occupy, requisition, acquire or take over any plant or part thereof, or any ship, charter, or material, in accordance with the provisions hereof, it shall make just compensation therefor, to be determined by the President. . . . The President may exercise the power and authority hereby vested in him . . . through such agency or agencies as he shall determine from time to time. . . . All ships constructed, purchased, or requisitioned under authority herein . . . shall be managed, operated, and disposed of as the President may direct."

By Executive Order of July 11, 1917, No. 2664, the President, by virtue of the authority vested in him by this Act, directed, among other things, " that the United States Shipping Board shall have and exercise all power and authority vested in me in . . . said act, in so far as applicable to and in furtherance of the taking over of title or possession, by purchase or requisition, of constructed vessels, or parts thereof, or charters therein; and the operation, management, and disposition of such vessels. . . . The powers herein delegated to the United States Shipping Board may, in the discretion of said Board, be exercised directly by the said Board or by it through the United States Shipping Board Emergency Fleet Corporation. . . ."

The findings show that in August, 1917, the respondents entered, simultaneously, into two separate charter parties with different companies: one providing for the transportation of lumber from British Columbia to Melbourne, Australia; and the other providing that the vessel on her return voyage should transport a cargo of chrome ore from New Caledonia to New York or Baltimore, at a stipulated rate which would yield $177,000. This return charter was approved by the United States Shipping Board. The vessel proceeded on her outward voyage, ar-

rived in Melbourne on March 9, 1918, discharged the cargo of lumber, and was ready to sail for New Caledonia on April 10. Meanwhile, on or about April 5, certain officials of the United States Shipping Board and War Industries Board and of the British and Australian Governments, had entered upon the discussion of requiring or requesting American-owned vessels, including the *Betsy Ross,* to return to an American port with cargoes of wheat; but owing to differences of opinion the discussion was continued until May 9. On April 5, the master of the vessel applied to the authorities at Melbourne for clearance papers; but they declined to grant clearance, advising the respondents' agent at Melbourne that this action was taken at the request of the United States Shipping Board, and on April 17 notified the respondents' agent that a cable had been received from the Secretary of State stating that the Shipping Board considered the vessel suitable for wheat and requested that she load wheat and not chrome ore. The respondents made various efforts to have the vessel cleared in order that she might carry out her chrome ore charter, but action on their requests was delayed until May 9, " pending a decision being reached by the United States Shipping Board that the vessel would be ordered to abandon her chrome-ore charter and return to the United States with a cargo of wheat. . . . Shortly after [the respondents] were so notified by said Australian officials," the United States Food Administration Grain Corporation, at its office in New York, submitted to the managing owner of the vessel a charter party for the transportation of a cargo of wheat from Melbourne to New York, at a stipulated rate. The respondents, as the result of their negotiation with the Food Administration " concluded that rather than have the United States Government take over " the vessel they " had better sign said wheat charter "; and they did this on May 15. On her return voyage with the cargo

of wheat the vessel arrived in New York about the time of the armistice, and the respondents were paid by the Food Administration $63,784, at the rate provided in the charter. The respondents thereupon presented to the Shipping Board their claim for an award of compensation,[1] which was disallowed in 1920. Thereafter the respondents brought this suit.

In its opinion the Court of Claims said that the United States Shipping Board Emergency Fleet Corporation [2] had required the respondents to take on a cargo of wheat for the return voyage to the United States, and by this act had cancelled the contract which the respondents had for transporting the cargo of chrome ore, and that under the Act of 1917 the Government was required to pay them just compensation for the loss which they incurred by such cancellation. And, having found that the just compensation for the cancellation of the chrome ore contract was $113,216, with interest from May 9, 1918, the respondents were given judgment for that amount.

In our opinion the findings of fact do not sustain the judgment. Taking up the several contentions here made by the respondents under clauses (a), (b) and (e) of the Act of 1917, we reach the following conclusions:

1. The Shipping Board had no authority under clause (b) of the Act and the power delegated to it by the President to cancel the respondents' contract for the shipment of chrome ore. While this clause authorized the President to cancel contracts " for the building, production or purchase of ships or material," it gave no authority to cancel a contract for the carriage of freight. And the Act did not provide for compensation to the ship owners for the cancellation of such a contract. Furthermore, the find-

---

[1] This was in accordance with a requirement of the Act of 1917.

[2] No reference whatever had been made to the Fleet Corporation in the findings of fact.

ings do not show that either the Shipping Board (or the Emergency Fleet Corporation) in fact cancelled this contract. The most that appears—construing the findings most favorably to the respondents—is that they were notified by the Australian officials that the Shipping Board had decided that the vessel " would be ordered to abandon the chrome ore charter and return to the United States with a cargo of wheat "; that thereupon the respondents, without waiting until the Shipping Board made such an order, concluded that it would be better to sign the wheat charter with the Grain Corporation rather than have the Government take over the vessel; and that by carrying out this wheat charter they themselves made it impossible to perform the chrome ore charter.

2. There can be no recovery under clause (e) of the Act on the theory—upon which alone the respondents' petition was based—that the Shipping Board requisitioned or took over the vessel and deprived the respondents of its use. The findings not only fail to show any requisition or taking over of the vessel, but, on the contrary, show that it remained in the possession of the respondents and was used by them for their own benefit in carrying out the wheat charter which they made with the Grain Corporation for the very purpose of anticipating and preventing the taking over of the vessel by the Government. Compare *American Smelting Co.* v. *United States,* 259 U. S. 75, 78.

And even if the Shipping Board had in fact carried out its intention of ordering the vessel to abandon the chrome ore charter, and return to the United States with a cargo of wheat, this, plainly, would not have been the placing of " an order " for the ship within the meaning of clause (a) of the Act.

3. The Shipping Board did not requisition the chrome ore charter under clause (e) of the Act. This would have

required the Shipping Board to take over the charter itself for the transportation of chrome ore. This it did not do. The charter was not appropriated or kept alive for the use of the Government. See *Omnia Co.* v. *United States,* 261 U. S. 502, 513; *Union Petroleum S. S. Co.* v. *United States* (C. C. A.), 18 F. (2d) 752, 753.

In short, the findings show no facts entitling the respondents to recover compensation from the United States under the provisions of the Act of 1917. And the judgment is

*Reversed.*