ST. REGIS PAPER CO. v. UNITED STATES.

No. 47673.

Court of Claims.

April 5, 1948.

Horace R. Lamb, of New York City (LeBoeuf & Lamb, of New York City, on the brief), for plaintiff.

John B. Miller, of Washington, D. C., and Herbert A. Bergson, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and HOWELL, MADDEN, WHITAKER and LITTLETON, Judges.

JONES, Chief Justice.

The primary question is whether plaintiff's mill at Tacoma, Washington, was requisitioned by the defendant. The case involves the effects of orders and directives of the War Production Board in allocating and distributing pulpwood logs during the war period.

Plaintiff is a corporation engaged in manufacturing and selling bleached and unbleached kraft pulp. Raw material in the form of pulpwood logs of hemlock, spruce, fir and other softwoods is essential to it operations.

In 1942 pursuant to executive order issued under the Second War Powers Act[1] the War Production Board determined that there prevailed in the Puget Sound area in the State of Washington, within which area plaintiff's plant is located, a shortage of pulpwood needed for the defense of the United States. Accordingly it issued an order that after October 23, 1942, and until such order should be revoked, no plant in the defined area should consume, process or delivery any such pulpwood ex-cept upon a specific authorization of the War Production Board.

This and other orders had the effect of freezing the sources from which plaintiff could procure pulpwood from November 1, 1942, to April 1, 1944, with the result that plaintiff's plant remained closed during that time, it having no raw materials on which it was permitted to operate. Plaintiff had some logs on hand, but it was not permitted to consume these in the kind of manufacturing in which it was then engaged.

Plaintiff alleges that the orders constituted a taking of its private property for the use and benefit of the United States, and that the Government thereby became obligated to make just compensation under the provisions of the Fifth Amendment to the Constitution. It claims $376,754.86 as out-of-pocket expenses during the shutdown period, $228,173.14 deterioration and depreciation charges, and $2,694,686.83 as plaintiff's lost profits during the shutdown period.

Defendant contends that the action of the Government did not constitute a taking of plaintiff's property, but that its acts were those of the sovereign in the proper constitutional exercise of its police and war powers, and that the defendant cannot be held liable for the valid exercise of such powers.

The issue, then, is whether the exercise of the President's war powers through general orders and directives of the War Production Board allocating and controlling the consumption of pulpwood as a defense measure constituted taking by the Government of plaintiff's property for public use within the meaning of the Fifth Amendment to the Constitution.

We do not think that the allegations in plaintiff's petition are sufficient under the limitations set out and defined in the decisions of the Supreme Court, this court and other courts of the country to establish such a taking.

It is manifest from the allegations in the petition and the exhibits which are there-

---

1 50 U.S.C.A.Appendix §§ 1152 and 633.

to attached, that there was a serious shortage of logs in the Puget Sound area; that according to the stated purpose of the restriction order immediate steps were required to reserve the remaining logs to insure uninterrupted production of highly essential nitrating and dissolving pulp; that the wood supply problem in the Puget Sound area was thoroughly studied by the Board and that it was found that the high operation rate in making nitrating and dissolving pulp made it necessary to curtail materially the use of logs of this type. When the petition and attached exhibits are construed as a whole, it is manifest that the action was taken as a defense measure.

■ The exercise of such powers under the War Powers Act of 1942, unless unreasonably invoked or improperly carried out, was a valid use by the legislative and executive branches. Gallagher's Steak House v. Bowles, 2 Cir., 142 F.2d 530, certiorari denied 322 U.S. 764, 64 S.Ct. 1288, 88 L.Ed. 1591; Shreveport Engraving Co. v. United States, 5 Cir., 143 F.2d 222; certiorari denied 323 U.S. 749, 65 S.Ct. 82, 89 L.Ed. 600.

■ We do not think the right of recovery is limited under the Tucker Act, 28 U.S.C.A. § 41(20), to such a taking as would give rise to a contract, express or implied in fact, to pay compensation. The act is much broader than that and includes among other things "all claims founded upon the Constitution or any law of Congress." Where the authorized representative performs an act the defendant must be presumed to have intended the natural consequences of such act. The intention will be presumed from the action taken. These distinctions are well set out in the opinion in the case of Cotton Land Company v. United States, 109 Ct.Cl. 816, and authorities cited. Even so, however, the facts and circumstances must be such as to constitute a taking of the property. Van Sant et al., v. United States, 75 Ct.Cl. 562, 566.

In Royal Holland Lloyd v. United States, 73 Ct.Cl. 722, at page 732, the court used the following language:

"But the question presented is whether or not the refusal to grant clearance to the Zeelandia constituted a 'taking' of private property, within the meaning of the Fifth Amendment. * * *

"It has been repeatedly held that acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are not a 'taking' within the meaning of the constitutional provision. Transportation Co. v. Chicago, 99 U.S. 635 [25 L.Ed. 336]; United States v. Carver, 278 U.S. 294 [49 S.Ct. 100, 73 L.Ed. 387]; Graham v. United States, 2 Ct.Cl. 327. In order to come within the constitutional provision, there must be shown to have been an exercise, by the United States, of a proprietary right, for a greater or less time, in the property taken. Graham v. United States, supra. Furthermore, a taking, within the meaning of the constitutional provision must have been an intentional appropriation of the property to the public use, and the appropriation must have been authorized by law. Atwater & Co. v. United States, 275 U.S. 188 [48 S.Ct. 90, 72 L.Ed. 229]; Transportation Co. v. Chicago, supra; United States v. Carver, supra."

■ It is not sufficient that damages have resulted or that hardships have occurred. War inevitably produces hardships, suffering and losses, some of which cannot be measured in money. Legitimate war powers must be exercised, whatever the cost. Otherwise everything is lost. Ordinarily the sovereign, acting in the interest of all, is exempt from legal liability. The United States has given consent that it be sued in certain kinds of cases, but in order to maintain a suit in this court any litigant must bring its action within the constitutional or statutory limits of that permission.

In Morrisdale Coal Co. v. United States, 55 Ct.Cl. 310, 316 (affirmed by the Supreme Court 259 U.S. 188, 42 S.Ct. 481, 66 L.Ed. 892) the court used the following language: "It has been repeatedly held by the Supreme Court of the United States that when governmental powers are legitimately exercised for the public good, and the injury complained of is only incidental to

834

their exercise, there is no taking of property for the public use."

We believe it will be found that in all cases in which recovery has been allowed there has been a taking by the Government of a right or interest in the property. Transportation Co. v. Chicago, 99 U.S. 635, 25 L.Ed. 336; Omnia Commercial Co. v. United States, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773.

The plaintiff relies heavily upon the case of International Paper Co. v. United States, 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410. In that case, however, the International Paper Co. actually owned a part of the water rights in the canal. The Government directed another company to take and use all of the water in the canal, placing a requisition upon the power company for the production of all the electrical power capable of being produced through the full use of all the water in the canal, including that part to which the paper company had a right through an established lease.

It is true that the value of the water taken was measured by its value to the International Paper Company; nevertheless, there was an actual taking of the water. In the Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287, a servitude or easement was placed upon the land by the Government by virtue of installing guns and firing them across the property in such a way as to destroy its value. In United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, there was a taking of an easement in the land.

Thus it will be seen that the uniform holding of the courts has been that there must be an actual taking of some right in the property.

■ The plaintiff asserts that the action taken by the defendant had exactly the same effect and resulted in the same losses that would have occurred had the property been actually taken by the defendant. This may be true, but the fact remains that the property was left in the hands of the plaintiff and the facts do not bring it within the rules laid down by the courts in con-struing the Fifth Amendment in such a way as to permit a recovery of such damages in this court.

■ The plaintiff makes the further point that after it had been refused permission to use the type of logs which it had been utilizing for the purpose of making kraft pulp it asked an allotment for the purpose of making nitrating pulp and multiwall bags which it claimed would be useful for both civilian and war purposes. This request was refused on the ground that there was too great a concentration of the production facilities for these purposes in the Puget Sound area and that these could be produced to better advantage and on a safer basis in other areas of the country where facilities were available and where the labor shortage was less acute. At that particular time it was believed that there was imminent danger of destruction of essential war facilities, especially in the area where plaintiff's plant was located.

While this phase of the claim has presented some difficulty, when our minds are carried back to the conditions which prevailed at that time, we are unable to find that a provision for allocating the materials in such a way as to avoid too great a concentration and too great a constant danger of destruction was unreasonable.

Plaintiff places much emphasis, both in its petition and in its argument on demurrer, upon this rejection by the Government of plaintiff's request that it be allowed to continue the operation of its pulp plant either in the manufacture of nitrating pulp for sale to the United States or to manufacturers of materials for national defense in the manufacture of which nitrating pulp is used. Plaintiff does not quarrel with the reasons assigned by the War Production Board in not acceding to plaintiff's request, to wit, the undesirable concentration of the production of nitrating pulp already existing in the Puget Sound area, the strategic advantage enjoyed by the Southern mills, the ready supply of labor enjoyed by the latter, and the savings in transportation to be effected by diverting the manufacturing of nitrating pulp to mills closer to the nitrating plants they would be called upon to supply. On the

contrary, plaintiff concedes that it is not the function of this court to inquire into the motives which may have prompted the Government's representatives to take the action alleged to have adversely affected plaintiff's business, nor to pass upon the necessity for their so acting, the power to so act being admitted. Hamilton v. Kentucky Distilleries Co., 251 U.S. 146, 161, 40 S.Ct. 106, 64 L.Ed. 194. But, plaintiff contends, this determination to exclude plaintiff's Tacoma mill from participation in the manufacture of nitrating pulp, coupled with the Board's previous determination and direction to plaintiff, prohibiting it from consuming and processing any pulpwood in its pulp plant except upon specific authorization or direction by the Board, deprived plaintiff of its right to use and operate the plant for profit, and thus constituted an "appropriation" or "taking" of plaintiff's property for public use within the meaning of the Fifth Amendment.

Defendant, taking the contrary view, demurs to the petition and points to the absence of any showing that plaintiff's plant did not remain at all times within its own exclusive ownership, possession, and control, or that the Government had any semblance of ownership, possession, or use of the property, and argues that defendant did no more than deny to plaintiff the right to use certain critical raw materials in the operation of its plant, in the legitimate exercise of defendant's war powers as a sovereign.

It amply appears from the petition that defendant did not actually "acquire by condemnation, any real property, temporary use thereof, or other interest therein, together with any personal property located thereon or used therewith, that shall be deemed necessary, for * * * war purposes" as it might have done under authority of the Second War Powers Act, 56 Stat. 176, 177, 50 U.S.C.A.Appendix, § 632. It did not, as plaintiff argues, take over the complete dominion and control of plaintiff's property, nor appropriate to itself any right to the use and enjoyment of plaintiff's plant or any part thereof. On the other hand it is equally apparent from the allegations of the petition that the determinations and directions of the War Production Board respecting plaintiff's Tacoma plant did have the effect of depriving plaintiff of the use of said plant in the consumption and processing of pulpwood, in order that manufacturers in more strategic areas might employ, in the manufacture of war materials, the pulpwood which plaintiff would otherwise have consumed, and that it was intended to accomplish this end notwithstanding it should mean the forced closing down of plaintiff's mill. This does not mean, however, and the petition does not purport to so charge, that it was the Board's objective to shut down plaintiff's plant. It did not issue its General Preference Order No. M-251 to accomplish such an end. Its rejection of plaintiff's request to be permitted to convert to the manufacture of nitrating pulp was directed neither toward the gaining of any control of plaintiff's plant nor toward the destruction of its ability to operate profitably, though it may have been made aware that this latter would follow as a necessary consequence of its action.

It has been held that even where there is a taking recovery is limited to the value of the property or right in the property taken, and that there is nonliability for the incidental damage to or destruction of business which is not itself taken. Mitchell v. United States, 267 U.S. 341, 345, 45 S.Ct. 293, 69 L.Ed. 644; Sirio Match Co. v. United States, 81 Ct.Cl. 427.

In Mitchell v. United States, supra [267 U.S. 341, 45 S.Ct. 294], the following language is used: "No recovery therefor can be had now as for a taking of the business. There is no finding as a fact that the government took the business, or that what it did was intended as a taking. If the business was destroyed, the destruction was an unintended incident of the taking of land. There can be no recovery under the Tucker Act * * * if the intention to take is lacking."

This is a case of actual hardship. The damages are both real and substantial. But in the light of the decisions of the Supreme Court, the Tucker Act, and the established

rules of law, this court does not have jurisdiction to grant the relief sought.

The demurrer is sustained and the petition dismissed.

It is so ordered.

HOWELL, MADDEN, WHITAKER and LITTLETON, JJ., concur.