**Clark E. FINKS, and Francis Arthur Willette, Jr.**

v.

**The UNITED STATES.**

No. 65–65.

United States Court of Claims.

June 14, 1968.

J. Gordon Forester, Jr., Washington, D. C., attorney of record, for plaintiffs.

George M. Beasley, III, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

### ON PLAINTIFFS' AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

LARAMORE, Judge.

Plaintiffs, Clark E. Finks and Francis Arthur Willette, Jr., were employed by the United States Agency for Industrial Development (USAID) as Foreign Service Officers for a 2-year term which began on November 9, 1962 and November 16, 1962, respectively. They were stationed at Recife, Brazil.

Each had purchased a 1963 automobile from the Foreign Distributors Division of the General Motors Corporation. These vehicles could be imported into Brazil without payment of any Brazilian customs or duties under a diplomatic agreement between Brazil and the United States. That agreement provided for the waiver of Brazilian customs and duties for certain diplomatic personnel if requested by the United States Embassy. The Embassy certified to the Ministry of Foreign Affairs that the plaintiffs qualified for duty-free importation and noted that Brazilian law precluded duty-free resale of their vehicles without prior authorization from the Ministry.

Plaintiffs claim that by impounding their vehicles the USAID took their property without just compensation in violation of the Fifth Amendment of the Constitution for which they are entitled to $12,000 each. That sum represents the market value of the automobiles in Brazil.

This case is before us on cross-motions for summary judgment. Each party agrees that there are no material facts in dispute. We find that there has not been a compensable "taking," and there-

fore we grant defendant's motion for summary judgment.

## I.

When the vehicles were purchased in the United States, plaintiffs, to obtain an exemption from the manufacturer's excise tax imposed by the United States on the sale of automobiles, signed a document provided by the Internal Revenue Service titled "Statement of Purchase for Export and Disposal in Foreign Country." That document provides:

> In order to qualify for purchase without payment of Federal Excise Tax, I state herewith that this * * * automobile will be exported prior to use in the United States and will be resold or otherwise disposed of in a foreign country and will not be returned to the United States.[1]

To finance their purchases plaintiffs obtained $1,000 each from a Brazilian national named Demetrio Antonio da Silva. They have consistently maintained that this money was a loan, but da Silva, with equal obduracy, has claimed that the money was a down-payment on plaintiffs' agreement to sell him the automobiles after they became available for duty-free resale.

The vehicles were shipped from the United States and subsequently released from Recife Customs in October and November, 1963. Thereafter, they were used for plaintiffs' personal use.

During June and July of 1964, several Brazilian used car dealers offered to buy the automobiles. At about this time USAID officials realized that there had been an increase in the number of automobiles sold duty-free to Brazilians by diplomatic personnel who had imported the vehicles duty-free. To stop this evasion of Brazilian customs duties, the USAID notified all of its employees that they must terminate any then-existing agreements wherein a Brazilian had furnished all or part of the cost of a vehicle imported duty-free in return for a promise that the vehicle would be sold to him when it became eligible for resale. Plaintiffs, specifically, were told to repay da Silva the $2,000 that had been "loaned" to them.

We note that this problem of duty-free resale existed long before plaintiffs arrived in Brazil. In November 1962, Finks and Willette signed a June 19, 1962 memorandum from the USAID "certifying that * * * [they] received, read and understood" the necessity for complying with Embassy Instruction No. 103. (Defendant's exhibits No. 7 and No. 8.) That Instruction explains the procedure for disposition of a duty-free automobile and includes the statement: "under no circumstances may it [an eligible vehicle] be turned over to any buyer until and unless the Brazilian Government has issued the sales authorization document nor may any sales transaction be consummated prior to that time." In addition, it continues: "The sale of any vehicle is not authorized, even if approved by the Embassy, until customs officials have issued the required authority to the Municipal and State Officials."

Plaintiffs have offered no evidence which contradicts their knowledge of these procedures. The Instructions contain a provision which is applicable to plaintiffs. It reads: "Persons who resign and remain in Brazil * * * shall be required to pay duty on the vehicles if the resignation occurs when the vehicle has been in the country less than two years. The Brazilian Government will not assess duty, however, if the vehicle is exported, or if sold to a person who had duty-free privileges, * * *.

---

1. If the vehicles were returned to the United States plaintiffs might have violated the terms of their exemption from (and become liable for) the amount of excise taxes which would otherwise have been payable on the purchase of the vehicles. Defendant notes that plaintiff would probably have been exempted from the excise taxes imposed on imports to the United States. In any event, plaintiffs were not prohibited by their statements from returning the vehicles to the United States as they argue, albeit returning them might create a tax liability.

\* \* \* Ve' 'les that have been in the country less t.. .n two years, but more than one year, may be sold to anyone, *if the owner is eligible under these regulations and is transferred permanently from Brazil.*" [Emphasis supplied.] Plaintiffs v.·hicles cleared Recife customs in October and November of 1963, and plaintiffs were in the process of accomplishing a sale in November of 1964 (approximately one year later) when they tendered their resignations. Plaintiffs knew that their sales were subject to the approval of both the Embassy and the Ministry as explained in the Instructions given to them on their arrival in Brazil.

On August 1, 1964, plaintiffs, da Silva and his attorney, met in da Silva's apartment at his request. The following day, da Silva accused plaintiffs of breaking into his apartment, destroying certain documents which proved his ownership of the automobiles, and assault. On the same day, he accused plaintiffs of an attempted swindle and filed criminal charges. The record does not indicate if these charges were ever sustained in subsequent legal proceedings.

On August 20, da Silva filed a petition in the local Recife court asserting his claim of ownership and asking the court to seize the vehicles. A preliminary writ was issued, and on August 22 the vehicles were impounded by the Brazilian police.

On August 26, before any decision was reached in the seizure case, da Silva filed another petition in which he requested specific performance of his alleged contract (a comminatory action under Brazilian law).

After a full hearing on September 29 the original seizure writ was revoked, and the judge directed the police to return the vehicles to plaintiffs. He found that da Silva had been unable to offer sufficient evidence to establish ownership and noted that customs duties would have to be paid if a sale occurred. The papers submitted in the seizure action were attached to the comminatory petition.

Two USAID officials met with plaintiffs, and together they agreed that the vehicles, when released pursuant to the September 29 order, should be sent to Rio de Janeiro for safekeeping from possible harm by da Silva. On October 22 the vehicles were released to plaintiffs and an official from USAID. The automobiles were delivered to a local garage for servicing, and the attendant was told that plaintiffs and the USAID man would return the next afternoon. That evening, however, plaintiffs were ordered by the USAID to leave Brazil within two days and to return to the United States. The USAID agreed to dispose of the vehicles as plaintiffs would instruct. The following morning, plaintiffs submitted their resignations, effective November 22, 1964. They then proceeded to the garage and asked that the vehicles be ready for them at 11 o'clock that morning. The attendant notified the USAID of plaintiffs' request, and pursuant to Embassy instructions, USAID officials impounded the vehicles pending clarification of plaintiffs' intentions. It is this act which plaintiffs contend was a taking of their property, compensable under the Fifth Amendment. The facts surrounding, and following, the impounding procedure color the USAID's action and reveal that, in no manner was this a constitutional "taking" of private property for a "public use".

Plaintiffs had openly and continuously declared that they intended to sell the vehicles, flouting the Embassy directive prohibiting this procedure and threatening to violate Brazilian customs law. The Embassy, in its attempt to stop any sale which would violate treaty agreements and Brazilian law, ordered the vehicles held. At all relevant times the vehicles remained subject to plaintiffs' disposition. Their rights of ownership were limited to the extent that the USAID would not permit a disposition in violation of Brazilian law, a limitation imposed upon all similarly situated owners of duty-free automobiles. (In the absence of appropriate authorization for

the duty-free resale—which had not been obtained—a sale by plaintiffs would violate Brazilian law if they refused to pay duties.) Admittedly, the USAID temporarily deprived plaintiffs of their possession, but only for the limited stated purpose of controlling the ultimate disposition of the vehicles, as finally determined by plaintiffs.

Several demands for return of the vehicles followed. All were denied because plaintiffs refused to agree that the vehicles would not be sold "duty-free," i. e., without payment of duties.

On November 25, the United States Ambassador, Lincoln Gordon, offered plaintiffs three choices. They could either pay the customs duties and sell the vehicles in Brazil; they could have the vehicles returned to the United States (at government expense); or they could permit the automobiles to rust in storage. (No mention was made of the then-pending specific performance litigation between da Silva and plaintiffs.) All of these suggestions were refused, and plaintiffs reasserted their claim that they could dispose of the vehicles as they wanted, as a matter of right, and that this right was not subject to the control of either the USAID or the Embassy, or even the President of the United States.

On November 23, plaintiffs were told that the Embassy would not request permission from the Brazilian authorities for a duty-free sale of their automobiles. That authorization is *the* essential prerequisite before vehicles, imported duty-free, may legally be sold duty-free. Plaintiffs have admitted: "all that was lacking was the administrative approval of the United States officials." The absence of Embassy approval and a request from the Embassy to the Ministry (which results in the appropriate authorization) is an insurmountable barrier to a legal duty-free sale.

Plaintiffs did not leave Brazil until December 14. On December 3, USAID officials notified the Inspector General of Customs that the vehicles were "at the disposal of the Recife Customs office until such time as the situation with respect to the cars is cleared up in accordance with the wishes of their owners, that is as to whether the respective duties and taxes are to be paid or whether the cars are to be re-exported from Brazil." The Recife office asked the USAID to continue to store the vehicles at its warehouse. In February 1965, plaintiffs wrote to the USAID, repeating their intentions not to ship the automobiles to the United States. They never agreed to pay customs duties.

On September 16, 1965, almost one year after the vehicles were impounded, a hearing was held on da Silva's specific performance action. Plaintiffs were represented by Brazilian counsel. On September 29, the court declared da Silva owner of the vehicles. On October 8, the Recife Customs office asked the USAID to transfer the vehicles to its warehouse because final disposition of the specific performance litigation would affect customs and duty payments.

Plaintiffs' Brazilian attorney filed an appeal from the adverse decision of the lower court. On November 12, however, he filed a motion to vacate the appeal because he had been instructed by plaintiffs not to continue. The Recife Customs office filed a third-party petition in the appeal proceeding requesting payment of customs duties from whomever the court declared owner of the vehicles. On April 13, 1967, the Customs office withdrew its petition in response to da Silva's payment of the customs duties. The vehicles were given to da Silva pursuant to the lower court's order.

## II.

Before we analyze the applicability of the Fifth Amendment to these facts, we find it necessary to explain, briefly, the procedures which permit importation duty-free and resale duty-free of an American automobile by diplomatic personnel. A Bureau of Customs (Brazil) Circular (placed in evidence by both parties) details the procedures which the American Embassy is obliged to fol-

low. If the requisite conditions are met and the procedures followed, the Ministry of Foreign Affairs may permit a duty-free resale.

A vehicle becomes eligible for duty-free resale if two years have elapsed since the vehicle cleared Brazilian customs, or if an owner is transferred out of Brazil and the vehicle has been in the country more than one year. The Embassy Instructions previously referred to explain that persons who resign and permanently depart from Brazil may be permitted to sell their vehicles if the vehicles have been in Brazil more than a year. (Plaintiffs assert that they are within this provision.) If the vehicles have been in Brazil less than a year resale, duty-free, is possible only if the sale is to a person who, himself, might have imported a vehicle duty-free. Persons who resign but remain in Brazil must pay duties on any vehicle in the country less than two years.

These conditions do not limit a right of resale; nor do they invalidate a resale. They merely prescribe the conditions under which a *duty-free* resale might be accomplished.

Diplomatic personnel do not have a *right* to sell their vehicles duty-free, even if these conditions are fulfilled. Compliance with these time requirements will make a vehicle eligible for duty-free resale. Authorization for the sale is necessary before a resale qualifies. To obtain authorization, the Embassy must request permission from the Ministry. Both the Embassy and the Ministry might refuse to act. If this should occur, as in this case when the Embassy refused to request authorization, a sale might be completed, but not without payment of the duties which had been waived at importation. We note, again, that plaintiffs admit that this authorization was never obtained, and that they never made known any intention other than disposing of the vehicles by an unauthorized duty-free sale (i. e., a sale without payment of any duties). A sale, without an authorization, effectively revokes any prior waiver of duties.

III.

■ The Fifth Amendment provides: "nor shall private property be taken for public use without just compensation." We are compelled, initially, to determine if there has been an appropriation, or seizure of property which constitutes a "taking". Cuban Truck & Equipment Co. v. United States, 333 F.2d 873, 166 Ct.Cl. 381 (1964), cert. denied 382 U.S. 844, 86 S.Ct. 65, 15 L.Ed.2d 85 (1965). We find that plaintiffs' property was not appropriated within the scope of the Fifth Amendment, nor was it devoted to a "public use".

In Societe Cotonniere Du Tonkin v. United States, 171 F.Supp. 951, 145 Ct. Cl. 426 (1959), cert. denied 361 U.S. 965, 80 S.Ct. 594, 4 L.Ed.2d 545 (1960), we discussed the nature of a compensable taking. We said:

> The elements necessary to prove a compensable "taking" are well-defined. *It must first be shown that there was an effective "taking" of the property by the Government.* It is not necessary that there be a "taking" in the sense of one being deprived of legal title or physical possession. *Substantial* interference with the owner's use of the property is sufficient. [Citations omitted and emphasis supplied. 171 F.Supp at 959, 145 Ct.Cl. at 441.]

Our only concern in this case is with the nature of an appropriation, exercise *of control,* or a seizure which constitutes either a "taking" or a "substantial" interference with proprietary rights. In United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), the Court defined a constitutional taking:

> Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time. [331 U.S. at 748, 67 S.Ct. at 1385.]

Again, in Franco-Italian Packing Co. v. United States, 128 F.Supp. 408, 130 Ct.Cl. 736 (1955), we found that "a compensable exercise of the eminent

domain power, [occurs when] a property interest is taken from the owner and applied to the public use because the use of such property is beneficial to the public * * *." [128 F.Supp. at 414, 130 Ct.Cl. at 745–746.]

■ It is clear that not every deprivation of use, possession, or control is a "taking". It is the character and extent of an invasion of property rights which are determinative. United States v. Causby, 328 U.S. 256, 266, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). It is equally clear that not all takings of property are compensable. See e. g., Houck v. Little River Drainage District, 239 U.S. 254, 36 S.Ct. 58, 60 L.Ed. 266 (1915); General Motors Acceptance Corp. v. United States, 286 U.S. 49, 52 S.Ct. 468, 76 L.Ed. 971 (1932). Nor is an interference with the use of property a compensable taking if it is the result of a sovereign act. See e. g., New Orleans Public Service, Inc. v. City of New Orleans, 281 U.S. 682, 50 S.Ct. 449, 74 L.Ed. 1115 (1930); United States v. Carver, 278 U.S. 294, 49 S.Ct. 100, 73 L.Ed. 387 (1929).

We need not pursue this inquiry beyond the basic question posed, i. e., was there an appropriation. The record conclusively proves that there was not. The vehicles were impounded and plaintiffs were deprived of their possession. That deprivation, however, was temporary in nature. The government repeatedly offered to return the vehicles if plaintiffs would agree not to violate Brazilian law. The vehicles remained within plaintiffs' control. On several occasions the government took pains to repeat its statement that the vehicles would be disposed of according to plaintiffs' directions. If plaintiffs failed to decide what was to be done with the vehicles they were to remain in storage. There was no indication that the government would make any use of the vehicles, public or otherwise, at any time.

Plaintiffs knew that the vehicles were being held only to prevent an illegal disposition, and that they would be returned if plaintiffs chose some method of dispos-

al other than the one which had been proscribed. At most, the government restricted plaintiffs' absolute right to dispose of their property, even if that disposal violated treaty agreements and Brazilian law. This restriction and the impounding procedure undertaken to enforce it are not a "taking". Nor are they a "substantial" interference with plaintiffs' property rights. We find that this temporary denial of possession is not an appropriation. No "servitude" of any kind was acquired.

Plaintiffs state that they rely principally on our decisions in Turney v. United States, 115 F.Supp. 457, 126 Ct.Cl. 202 (1953); Seery v. United States, 127 F.Supp. 601, 130 Ct.Cl. 481 (1955); and Miller v. United States, 140 F.Supp. 789, 135 Ct.Cl. 1 (1956). Those decisions do not support plaintiffs' claim because the seizures and appropriations therein involved were clearly not temporary, and there were never any offers or attempts to return the appropriated property.

In Turney v. United States, supra, plaintiff unknowingly purchased radar equipment (classified material) from the Philippine Government as part of a surplus material lot of merchandise which the United States had previously given to the Philippine Government. Neither party knew that the radar equipment was classified. The United States later repossessed the radar equipment. Plaintiff was permanently deprived of his ownership. No offer to retain the property for future disposition was made. The government simply confiscated the property, and we awarded compensation.

In contrast, plaintiffs' vehicles were subject to their control and were always available limited only by a restriction which involved non-violation of Brazilian law. Only after the local court, in 1967, ordered the property given to da Silva (after da Silva had paid the requisite customs duties) did plaintiffs' ownership and control terminate.

In Seery v. United States, supra the United States Army appropriated the home of a naturalized Austrian citizen

for its use as an Officer's Club in Austria. Plaintiff was deprived of her use, possession, control and right to dispose of her property, for an indefinite period. We found a "taking" and gave compensation. Plaintiffs, in our case, have not shown a comparable appropriation.

In Miller v. United States, supra, the United States impounded airplanes which, it alleged, plaintiff had contracted to sell in violation of foreign policy. Plaintiff repeatedly assured the government that any sale would be in accordance with national policy, but the government refused to return the airplanes. Defendant repossessed the planes, and then sold them to another purchaser. We found a compensable taking had occurred.

In our case, plaintiffs refused to agree to dispose of the property in conformity with treaty agreements and Brazilian law. The exercise of dominion and control by delivering the vehicles to Brazilian officials (which plaintiffs allege evidences a "taking"), was an action taken by the USAID in direct response to a request from Recife officials, pursuant to the decision of the lower court in awarding da Silva ownership and after plaintiffs had refused to act. The vehicles were given to the customs officials to permit them to collect the customs duties. These duties were then payable, and plaintiffs' rights of ownership were ended by the decision of the local Brazilian court. This was not a "taking" by the United States.

The only other relevant exercise of control by the USAID was to make the vehicles "available" to the Recife customs after the Embassy had decided not to request a duty-free sale. This merely notified the customs officials that duties would be payable if plaintiffs chose to dispose of automobiles by a sale in Brazil. This "notification procedure" was not a "taking".

These decisions give no comfort to plaintiffs' claim. Plaintiffs' insistence on an absolute right to dispose of their property duty-free is incorrect. The limitations imposed were in accordance with treaty agreements, and no action by the USAID or the Embassy establishes, or even indicates, an appropriation to a public use compensable under the Fifth Amendment.

In accordance with the foregoing, defendant's motion for summary judgment is granted, and plaintiffs' motion for summary judgment is denied. The petition is, therefore, dismissed.