Wilmot, J.,
delivered the opinion, of the Court.
The claim in this case is for private property destroyed and abandoned in Arizona on the 15th of July, 18G1, by order of Captain J. N. Moore, commanding United States troops in the vicinity of Tucson. Grant was a contractor with the government for furnishing commissary and quartermaster supplies for the forts and military posts in Arizona, and in furtherance of his contract had expended large sums of money in the repair and erection of flouring mills, dwelling-houses, storehouses, shops, and corrals. He had personal property also of considerable value, consisting in part of-flour, wheat, corn, barley, beans, merchandise, furniture, &e. In the mills and storehouses of Grant were valuable supplies belonging to the government.
The people of Tucson were lawless adventurers and intensely hostile to the government of the United States. Lieutenant Lord speaks of the citizens of the Territory as “traitors of the deepest die;” “that they openly talked secession long before the war commenced, especially those in the vicinity of Tucson.” Captain Chapin in his deposition says “ Tucson was full of gamblers and murderers. Large numbers of the white people were southerners in feeling, and ready to take up arms for the southern cause. Exceptions (o this rule were rare.” A *42 Confederate flag was flying at Tucson ; and when the property was burnt the people assembled in large numbers, armed, and with such threatening demonstrations as induced Lieutenant Lord to prepare for an expected attack on his train. Fort Breckinridge had been burnt and abandoned on the 10th of July, and Captain Moore had received information by express that Fort Buchanan was also to be abandoned and destroyed. He also had information that Texan rebel forces held Fort Union, and were determined to occupy the Territory and cut off the United States troops within it. With this information and the state of things as he knew them to exist at Tucson, Captain Moore directed Lieutenant Lord, commanding a company of dragoons, to destroy such government stores as ho could not transport, together with such private property of Grant as might be of value to the public enemy or to the disloyal people of Tucson. On receiving information that Fort Buchanan was to be abandoned he took an escort and reached that fort in advance of the main body. In his report to the War Department he says: “On learning the urgency of the easel sent the enclosed written order to Lieutenant Lord, in command of troops en route from Fort Breckinridge; his report in the case I forward.” Neither the order nor the report here spoken of are before us. Lieutenant Lord, in his deposition, says: “ The property was destroyed in accordance with written orders given me by Captain J. N. Moore. I did make a report of the matter to Captain Moore, and he approved of it, and said he would enclose it in his report to the War Department, and that I should be favorably mentioned for the manner in which I had acted.” Captain Chapin, in command at Fort Buchanan, says in his deposition: “ Captain Moore told me the day after he arrived at Fort Buchanan that he had ordered Lieutenant Lord, now Captain Lord, to destroy all the public stores and all provisions that had been stored by Mr. Grant for the use of the government, Grant’s mill, and all other property that could not be transported or which would be of any benefit to the people of that country.”
We do not doubt from this evidence, taken in connexion with the active participation of Lieutenant Lord in the destruction of the property, himself setting fire to the largo mill, and giving orders to his men to fire the other buildings and property, that he acted under and in accordance with the express orders of Captain Moore. Lord notified Mr. Grant half an hour before the fire was set of his intention to burn all his buildings and property, and requested him to secure at once such valuables and papers as he wished to preserve. The fact *43 that Captain Moore gave the order for the destruction of the property for which compensation is claimed being established, it is immaterial whether it was written or verbal.
Is the government legally and equitably bound to indemnify Mr. Grant for the loss of his property under such circumstances? Was there apparent to the commanding officer such a necessity as justified its destruction ? Was it taken for public use ? A proper application of legal principles to the facts of the case will give a solution to these inquiries.
Every civilized State recognizes its obligation to make compensation for private property taken under pressure of State necessity, and for the public good. The State is the transcendental proprietary of all the property, real and personal, of its citizens or subjects. This transcendental right — the eminent domain of the State in all countries where rights are regulated by law — is so exercised as to work no wrong, to inflict no private injury, without giving to the party aggrieved ample redress. This doctrine was not engrafted on the public law to give license to despotic and arbitrary sovereigns. It has its foundation in the organization of societies and States, and is as essential to a republic as to the most absolute despotism. It is of the very ■essence of sovereignty, and without it a State could not perform its first and highest- duty, its own preservation. Vital as is this high prerogative of States, it must be exercised in subordination to the clear principles of justice and right. Whenever, from necessity or policy, a State appropriates to public use the private property of an individual, it is obliged, by a law as imperative as that in virtue of which it makes the appropriation, to give to the party aggrieved redress commensurate with the injury he has sustained. Upon any other principle the social compact would work mischief and wrong. The State would have the right to impoverish the citizen it was established to protect; to trample on those rights of property, security for which was one of the great objects of its creation.
Every elementary writer of authority sustains the views here taken of the duty and obligation of States.
“ When a sovereign disposes of the possessions of a community oían individual the alienation will be valid. But justice requires that this community or this individual be indemnified at the public charge.” (Vattel, 112.)
“ Is the State bound to indemnify individuals for the damages they have sustained in war? We may learn from Grotius that authors are *44 divided on this question. The damages under consideration are to he distinguished into two kinds — those done by the State itself or the sovereign, and those done by the enemy.. Of the first kind some are done deliberately and by way of precaution, as when a field, a house, or a garden, belonging to a private person, is taken for the purpose of erecting on the spot a town, a rampart, or any other piece of fortification; or where his standing com or storehouses are destroyed to prevent their being of use to the enemy. Such damages are to be made good to the individual who should bear only his quota of the loss.” (Vattel, 403.)
“ We must observe this, that the king may in two ways deprive his subjects of their right, either by way of punishment or by virtue of his eminent power. But if he do so in' the last way, it must be for some public advantage, and then the subject ought to receive, if possible, a just satisfaction for the loss he suffers out of the common stock.” (Grotius, b. 2, ch. 14, sec. 7.)
“ The State has an eminent right of property over the goods of the subjects, so that the State or those that represent it may make use of them, and even destroy and alienate them, not only on extreme necessity, but for the public benefit, to which we must add that the State is obliged to repair the damages suffered by any subject on that account out of the public stock. Neither shall the State be absolved from this obligation, though for the present not able to satisfy it; but whenever the State is in a capacity, this suspended obligation shall resume its force.” (Grotius, b. 3, ch. 20, sec. 7.)
The authorities cited are direct and emphatic, and are supported by every writer of respectability upon public and national law. It may safely be assumed as the settled and fundamental law of Christian and civilized States that governments are bound to make just indemnity to the citizen or subject whenever private property is taken for the public good, convenience, or safety.
The limitation imposed on the government of the United States in the exercise of its right of eminent domain by the fifth article of the amendments of the Constitution is a solemn recognition of this settled and fundamental law of States, and binds the government to .the observance of the principles of justice and right in its dealings with the citizen with the force of organic law. In this article it is declared that “private property shall not be taken for public use without just compensation.”
Was the property for which compensation is now claimed taken in *45 virtue of the right of eminent domain, or was it an exercise of right under the law of overruling necessity ? Or was the property destroyed, without right, and must the claimant look to the personal responsibility of those directly concerned in its destruction1? Eminent domain0 is a civil right, and rests upon property. It springs from the social compact, and is inherent in the sovereignty charged with the duties of civil government. The right arising out of extreme necessity is a natural right, older than States, and is in full force where society and property are unknown. It is the law of the savage as well as the most enlightened, and attaches to every individual under whatever conditions he may be placed. It is the right of self-defence, of self-preservation, and has no connexion whatever with the super-eminent right of the State. The one may be fettered by constitutional limitations — the other is beyond the reach of constitutions. Both may be said to depend upon necessity for their lawful exercise, but the one is a State, the other an individual necessity. The necessity in the one case admits of degrees, and is frequently no more than the public convenience, utility, or good; in the other the right can be exercised only in the last degree, when the necessity is imperative and overruling. It admits of no choice of remedies, and of no delay; and, from the nature of the right, it is beyond, and transcends, the sovereign authority. This subject underwent a most thorough and careful consideration in the courts of New Jersey and New York in a number of cases growing out of the great fire in the city of New York in the winter of 1835. By a statute of that State power was given to the mayor and two aldermen of the city to direct the destruction of buildings to arrest a conflagration. Much difference existed among the judges as to whether this statute was an exercise of the right of eminent domain or a regulation of the natural law of necessity. In Hale v. Lawrence, (3 Zabriskie, pages 728-29,) the Supreme Court of New Jersey held the following language:
“Whether or not a law authorizing the destruction of private property for public benefit or safety is to be esteemed a taking of it for public use, such a law is nevertheless an exercise of the right of eminent domain. The right to take or destroy private property by an individual in self-defence, or for the protection of life, liberty, or property, is of a widely different character. It does not appertain to sovereignty, but to individuals, considered as individuals; it is a natural right, of which government cannot deprive the citizen, and founded upon necessity, and not expediency. Lord Hale calls it the lex temporis et loci.”
*46 The Court of Errors of the State of New York, in the case of Russell v. The Mayor, &c., (2 Denio,) held that the authority given the mayor and aldermen to destroy buildings to arrest the spread of a fire ^yas not an exercise of eminent domain, but a regulation of the law of overruling necessity. Senator Hard, of the minority, delivered a very able dissenting opinion, in which some of his distinctions, bearing upon the case in hand, seem to be well taken. He says, (pages 486-87:)
“ The act of destroying the building by which the plaintiff lost his. goods was in the exercise of the right of eminent domain, and not by virtue of the law of overruling necessity. The distinction between these two rights, as laid down in the English books, is confused and somewhat contradictory, and not consonant with our notion of the rights of private property.”
“ The first case on the subject was the celebrated saltpetre case. The government asserted the arbitrary right to provide munitions of war from private property, under the pretext of overruling necessity; and all the justices sustained it. (12 Co., 12.) Mouse’s case was one of jettison, where, in a perilous storm at sea, the master of the barge threw overboard a part of the valuable cargo to save the lives of the passengers. (lb., 63.) This, too, was denominated a case of overruling necessity, and very justly, as it boro all the characteristic marks of that class of cases, while the other bore none of them. But in neither of these cases was the true distinction taken. In the first case, the saltpetre was taken by public authority, and for the general public good; while in the other, the property was destroyed by private authority and for individual benefit.”
The majority of the court do not controvert the soundness of the principles here laid down, but deny their application to the case under consideration. Indeed, their correctness is affirmed by Senator Porter in the opinion delivered by him, (page 484,) where he makes the following remarks by way of illustration, and the cases put by him bear a strong analogy to the one now before the court:
“A vessel may in time of war be taken from the owner when the interests of the government demand it; or it may be destroyed to prevent its falling into the hands of an enemy, and thereby increase its power of aggression or resistance; and the owner would be entitled under the Constitution to be paid a just compensation.”
Upon the authority of the cases cited, and others that might be adduced, as well as on the principles which distinguish a case of public necessity, utility, or good, from the overruling necessity which regulates the law- *47 of individuals, we are of opinion that the rightful taking of private property for use or destruction, when the public exigency demands it, by a military officer commanding any part of the public force, is an exercise of the right of eminent domain, and that such a case is' not governed by the law applicable to individuals.
The letter and spirit of the public law, and of the constitutional provision in this regard, require just compensation to be made in every case when private property is rightfully taken for public use, whether it b'e by legislative authority or under the powers necessarily exercised by those commanding our land and naval forces in time of war or imminent public danger. Hay private property be rightfully taken by a military officer, without legislative authority, for the public service, or destroyed to cripple and embarrass the enemy; or is he in every case, and under all circumstances, a trespasser % Every writer, and every judicial decision, gives an answer to these questions. Whenever the officer is justified, the liability of the public is established. Property is taken without legislative authority, but by official warrant, and under urgent necessity, and for the general good. Courts approve the conduct of the officer, and the Executive rewards him with promotion for faithful and efficient performance of duty. The exigencies of war forbid that the legislature should provide for the precise circumstances under which the eminent right of the State may be called into action. The fundamental law provides that private property shall not be taken for public use without just compensation. Is this provision of the Constitution answered when compensation is made for property taken under legislative authority, and denied when taken by military officers acting rightfully under the proper functions of their office % We think not. The obligation to make compensation is co-extensive with the right of the State to take private property for public use ; and whenever it is taken by competent- authority, the obligation of the State cannot be evaded.
We next come to consider the necessity under which this property was destroyed. It is necessity alone that gives the right to take private property for use or destruction. The clanger must be threatening — ■ such as demands immediate action, and when delay would work public injury. Unless the necessity is such as to justify the officer, he is a trespasser, and there is no liability on the part of the government. It is impossible to lay down with precision the degree of necessity, or imminence of the danger, that will furnish such justification. Each .case must stand on its own facts. The necessity must be urgent, but *48 it need not be overwhelming; the danger must apparently be near and impending, but it need not be actually present, threatening instant injury to the public interests. The officer must decide when the necessity has arisen that demands him to take private property for the public safety or good. If, however, the danger, as he ought to have seen, was remote, the necessity not pressing, courts will hold him personally responsible to the party aggrieved. In deciding upon the conduct of the officer, we must look at all the circumstances of danger by which he was surrounded, and to such information as he had, entitled to credit. It may be that there was no real danger, that his information was false, and that he acted under a supposed state of facts that did not exist. This would not affect his conduct so as to charge him personally, or relieve the State from responsibility. Had he good grounds for the belief that the facts were as they appeared to him ? Would a cool, prudent, discreet man have felt the necessity as urgent, and the danger impending? If so, the officer is justified, and the party who has suffered loss must look to the government alone for redress.
In the case of Mitchell v. Harmony this whole subject was very fully and ably treated by Chief Justice Taney in delivering the opinion of the court. We present some extracts from that opinion bearing directly upon the ease in hand.
First, as to the liability of the government for the acts of a military officer, on page 134:
“ There are occasions in which private property may be lawfully taken or destroyed to prevent it from falling into the hands of the public enemy ; also where a military officer, charged with a particular duty, may impress private property into the public service, or take it for public use. Unquestionably, in such cases, the government is bound to make full compensation to the owner.”
Again, he speaks of the degree of necessity that will justify the officer, and, in deciding upon this, we must take our view from the stand-point occupied by the officer himself:
“ But we are clearly of opinion that, in such cases, the danger must be immediate and impending, or the necessity urgent for the public service, such as will not admit of delay, and when the action of the civil authority would be too late in providing the means which the occasion calls for.”
“ In deciding upon the necessity, howevei, the state of facts as they appeared to the officer at the time he acted must govern the decision, *49 for he must necessarily act upon the information of others, as well as on his own observation; and if, with such information as he had a right to rely upon, there is reasonable ground for believing that the peril is imminent and menacing or the necessity urgent, he is justified in acting upon it, and the discovery afterwards that it was false or erroneous will not make him a trespasser.”
We have heretofore adverted to the circumstances under which the property of the claimant was destroyed. It was in a distant Territory, six or eight hundred miles from permanent and loyal settlements. The United States garrison occupying Fort Breckinridge, sixty miles distant, had, by order of the commanding general of the department, burnt and abandoned that fort, and were en route for Fort Buchanan, ninety miles on the other side of Tucsou. Within a day or two after the abandonment of Fort Breckinridge, an express brings information that Fort Buchanan was also to be destroyed and abandoned. On learning this, Captain Moore, with an escort, leaves the main body of his command under Lieutenant Lord, and hastens to Fort Buchanan. Here he is informed that rebel forces from Texas occupy Fort Union, the key to Arizona, and are pushing into the Territory with a view to its occupation and the cutting off of the United States forces within it. The people of Tucson gave indubitable evidence of their hostility to the government, and of their readiness to co-operate with the rebel insurgents. In Tucson were valuable military stores, in part the property of claimant, and buildings erected by him at considerable cost, which would give essential aid and support to the enemy. The commanding officer must act at once — the property must be destroyed, or fall into the hands of open and avowed enemies. Organized and armed rebel forces were understood to be advancing into the Territory, and the supplies and property, if left behind, would materially contribute to their purpose of occupation. Under these circumstances, Captain Moore gave the order for its destruction. We cannot say that he acted rashly, and without sufficient cause. The necessity to us appears to have been urgent — the danger impending. Texas, adjoining New Mexico, of which Arizona was then a part, was in flagrant rebellion. A few days after the destruction of the property at Tucson, Captain Moore received information that Fort Fillmore, with ten companies, had surrendered to the rebels, when he took to the mountains, finally bringing his command safely into Fort Craig. We do not believe that any court would hold his conduct in the destruction of this property *50 illegal and without justifiable cause; yet we must so hold, to relieve the government from responsibility.
Private property must not only be taken upon urgent necessity, but for public use, in order to fix the liability of the government to make compensation. Was the destruction of this property a taking of it for public use 1 It is almost of equal public importance that military supplies be kept from the use of the enemy, as that they minister to the support of our own armies. Writers on public law do not diserim-' inate between property destroyed to prevent it from falling into the hands of an enemy, and property taken for the actual sustenance of our own military forces. In both eases it is treated as a taking for public use. In the case of the American Print Works v. Lawrence, (Zabriskic,) the Supreme Court of Now Jersey affirm that “ the destruction of private property for public use is a taking of it .within the meaning of the Constitution.”
We hold, in this case, that the property was destroyed by the rightful order of the commanding officer, and upon an urgent and pressing necessity, and to prevent it from falling into the hands of the public enemy and those hostile to the United States; that it was a taking for public use; and that the government is bound under the Constitution to make just compensation to the owner. The legal duty to make compensation raises an implied promise to do so; and here is found the jurisdiction of this court to entertain this proceeding.
The damages remain to be considered. And here an objection is taken against the allowance of anything, on the ground that the property, in the circumstances in which it was placed, was without value to the owner; that the abandonment by the United States troops of the forts in the vicinity of Tucson was the inevitable loss to Grant of the entire property; and therefore its destruction did him no injury. This ground of objection, we believe, is without reason or law to support it. The claimant suffered great loss, Its immediate and direct cause was the burning of his property by order of Captain Moore; that the same loss would have befallen him in another way is an illiberal and, we think, illegal response to the claim for compensation. The property was of intrinsic value, and its worth to the enemy was the cause of its destruction. In a pecuniary point of view, it may have been a matter of indifference to the claimant whether his property was destroyed or fell into the hands of the enemy; but to the State it was of serious importance, and the government preferred to pay its fair value, rather than give its enemies the advantages of its possession. *51 In such cases, to hold the property worthless, and deny damages on that ground, is to deny the constitutional right to compensation. If the property is so circumstanced that, unless destroyed, the enemy would take it, then, on the principle contended for, no injury was done the owner; and, unless the grounds-were very strong, indeed, for believing it would be so taken, the destruction is illegal, and the government clearly not liable. It is the imminence of the danger, the pressing necessity that gives the State the right to take private property ; yet, on this hypothesis, when the danger becomes a certainty, the necessity inevitable, the government is relieved from liability. The legal maxim, damnum absque, injuria, would defeat the constitutional provision securing compensation, if effect were given to it in a case like the one before the court. It has no application whatever where property is actually 'taken for public use, and has been so held by the courts in numerous decisions. (See note on page 111, Sedgwick on the Measure of Damages.) It is only where the property is taken that the Constitution provides for compensation; it makes no mention of indirect or consequential damage; and here, and here only, the maxim damnum absque injuria applies. When the grantees of a franchise, or the agent of the State, acts within the strict line of authority, and indirect damage results from their acts, here there is no liability — it is damnum absque injuria. As when, in grading a street, an embankment is raised, or the ground cut down, to the injury of an adjoining owner, but none of his land is actually taken, here the maxim applies. It is an injury for which the agent is not liable, for he acted within the line of his duty; the State is not liable, because the Constitution provides for compensation only when property is actually taken for public use, and not for indirect injuries that may result from its exercise of the right of eminent domain.
The whole amount claimed is sixty-one thousand four hundred and eighteen dollars and forty-four cents.......................... $61,418 44
From this sum deduct eleven thousand two hundred and eighty dollars, property not destroyed......... $11,280 00
One per cent, on fifty thousand pounds of com and sixteen thousand pounds of heans, charged at five cents per pound................................ 660 00
Charge of transportation of 35,000 feet of lumber from the pineries.................................... 1,448 44
Value of mill site and privilege of old mill........... 2,500 00
Value of mill site and privilege of new mill.......... 4, 000 00
-- 19,888 44
41,530 00
Mr. J. S. Watts and M. li. Dunnell for the claimant.
Mr. J. D. McPherson, Assistant Solicitor, for the government.
These deductions from the total amount claimed leave the sum of forty-one thousand five hundred and thirty dollars as the damage that claimant is entitled to recover of the government.
Now, therefore, the court having considered the premises, it is ordered and adjudged that the said William S. Grant, the claimant, have and recover from the United States the sum of forty-one thousand five hundred and thirty dollars, to he paid in due course of law.
Loring, J., dissented.