Casey, C. J.,
delivered the opinion of the court:
In the year 1850 Dexter, Harrington & Co., of Boston, were- merchants doing business in that city. On the 24th December of the same year they made an arrangement with William H. DeForest for a mercantile adventure to San Juan del Norte, or Greytown, in the State of Nicarauga. In pursuance of this arrangement a cargo of goods was despatched by them to Mr. DeForest, at Greytown. By the agreement Dexter, Harrington & Co. were to furnish the goods from time to time; DeForest was to reside at Greytown, transact all the business, and share equally with them in the profits of the enterprise, after first paying the sums advanced by Dexter, Harrington & Co. for the goods.
In accordance with these arrangements DeForest established himself at Greytown, and continued to transact business there until July, 1854. For some part of the time he had associated with him one Tageda, but the latter does not appear to have had any understanding or connection with Dexter, Harrington & Co. Some time in 1851, Dexter, Harrington & Co. purchased and shipped to DeForest 21,000 pounds of powder. The powder arrived safely, and was stored for *421 greater security at Punta Arenas, across the bay from Greytown, near . the warehouses and depot of the Accessory Transit Company.
The passage across Central America had become a matter of great importance to the government and people of the United States, on account of it being one of the main routes of communication with our possessions on the Pacific coast. The Accessory Transit Company was composed principally of citizens of the United States, and was engaged in transporting passengers and freight between the Atlantic States and the Pacific coast, under rights and authorities derived from the loeal governments of that country.
By the year 1854 San Juan, or Greytown, as it was then called, had become the rendezvous of marauders and freebooters. They materially interfered with the operations and business of the transit company, committed depredations upon them, and upon other citizens of the United States. One of the accredited foreign ministers of the United States to a South American republic, on his way to or from his post, was treated with great indignity and violence. The consular agents of the United States at that place Were subjected to the same treatment.
These things being fully represented to the executive authorities of the United States, the President, through the Secretary of the Navy, ordered Commander Hollins to proceed thither with the ship-of-war Cyane, to seek and enforce reparation for the insult to the United. States and the injuries inflicted upon their citizens.
Commander Hollins arrived off Greytown, and communicated according to his instructions with Mr. Fabens, the commercial agent of the United States. He then made repeated demands upon the authorities of the place for indemnity for property of citizens taken or destroyed, and suitable apologies for the indignities offered the United States through her accredited diplomatic agents. These demands were treated with indifference or contempt, and accordingly, on the 13th July, 1854, and in pursuance of previous notice, he opened firq upon the place, battering down most of the buildings, and sending a force on shore to complete by burning what the bombardment had left.
It was suggested to Commander Hollins that the inhabitants of Greytown might take revenge for the punishment he had inflicted upon them by firing the building in which this 21,000 pounds of powder were stored, and thereby destroy the warehouse and property of the Transit Company, and the goods and merchandise of others intrusted to them. He thereupon took the powder and cast it into the bay, destroying the whole of it.
*422 Commander Hollins made an official return of his proceedings relating to the demand for reparation, the refusal of the authorities, and his bombardment and destruction of the town. His action was approved by the United States, and he commended for the prompt and efficient manner in which he had carried out his instructions. He does not mention the destruction of the powder in his official report. But, in' a subsequent despatch, dated 24th November, 1854, to Mr. Marey, Secretary of State, Commander Hollins details the destruction of the powder and the reasons which impelled him to do it.
The President in his annual message to Congress referred to the affair, and commended the energy and discretion with which Commander Hollins had executed the instructions of the government; and subsequently Secretary Marcy, in answer to a communication from the chairman of the Committee on Foreign Affairs in the Senate, appears to take for granted the liability of the United States for the powder in question, and that the ownership and value were the matters to be inquired into; and he suggests that the value was not above $12,000. By resolution of the Senate the claim was referred to this court.
We do not see how this case can be distinguished in principle from that of Grant v. The United States, 1 C. Cls., p. 41. There the property of a citizen, in one of the Territories of the United States, was destroyed' to prevent it from falling into the hands of the insurrectionary forces. Judge Wilmot reviews at length the grounds of the claim, and the authorities bearing upon the subject, and shows most clearly and conclusively that, whether the property be taken and appropriated by right of eminent domain, or destroyed to prevent other or greater injury to the public, the party is entitled to compensation. That this results as well from the principles of natural justice and equity as from the constitutional injunction to make compensation for private possessions devoted to public ends. We are entirely satisfied with the grounds there assumed, so far as they are applicable to the facts of this case, and can add nothing to the cogency or conclusiveness of the reasoning. Nor is it necessary to support it by further citations of authorities.
The Solicitor contends that the destruction of the powder was not embraced in Commander Hollins’s instructions, and that his acts were therefore merely a tort, for which he only, and not the United States, would be liable, as was decided by the Supreme Court of the United States in the case of Mitchell v. Harmony, 13 How., 134. It is true *423 that any agent or officer of the United States who, without any just x canse or lawful authority, takes or destroys the property of a citizen, though he act by color of his office, it will not shield him from damages at the suit of the injured party. And in such case the government is not liable, for it does not insure against the mistakes or wilful misconduct of its officers. Sometimes an officer is compelled, like Commander Hollins, in the ease before us, in carrying out his general instructions, to act upon his own judgment, and to exercise his discretion as to how far it may be essential for him to interfere with individual rights. In all such cases his conduct will be viewed with great liberality, wherever it is apparent that he acted with a view to the faithful execution of the trust committed to him.' And although there may have been no precedent authority for the particular act, yet its adoption by his government makes it an act of state, and for which the nation alone is responsible. The case of Buron v. Denman (2 Exch. Rep., 167) is a cáse directly in point. The plaintiff in that case was a Spaniard, who carried on the slave trade at the Gallinas, on the western coast of Africa, and in the pursuit of his calling had barra-coons erected along the coast, and had numerous slaves there. The defendant was a commander in the royal navy, and had been charged by his government with the liberation of a woman and her children, British subjects, held as captives by one of the native princes. In carrying out those instructions Commander Denman destroyed the plaintiff’s barracoons and liberated his slaves. Upon report made by him to his government his conduct was distinctly approved and commended by the ministers of state and the lords of the admiralty. And though the court of exchequer held that his conduct was unlawful, yet the act having been approved and adopted by the government, became thereby an act of state, for which the government alone was responsible.
So, in the present case, we have no doubt that Commander Hollins acted according to the best of his judgment, in view of all the facts with which he was surrounded. His government sustained him, and made his act its own.
The proof shows that the property was originally bought and paid for by Dexter, Harrington & Co. DeForest had no other interest or property than his contingent right to a moiety of the profits, if any there should be, after the close of the venture. The proof satisfies us that the enterprise was an unfortunate one, and attended with heavy losses to all concerned. There was, therefore, no real interest or property in the subject-matter in DeForest; but if any such had *424 vested in him by virtue of the arrangements with the claimants at the outstart of the adventure, it was fully divested by DeForest’s written relinquishment of all right to the claim to the claimants, dated July 18, 1855.
The evidence of the value of the powder at the place it was destroyed in 1854 is not' very clear and distinct. Mr. Marcy, in his communication to Congress in 1855, estimates it at $12,000. From the evidence now before us of its original cost, and the time and place where it was found, we think that too high a value. There is some evidence of a conditional sale of the powder, made some time before its destruction, at the sum of $6,000. It was not delivered in pursuance of that agreement, because the payment of the price could not be made or secured to the satisfaction of DeForest by the purchasers; but such an agreement furnishes fair and legitimate proof of what the owners were willing to sell for and purchasers willing to give; and that, in the absence of any evidence of a regular market value at the time and place, is probably the best proof that could be made. The length of time that has elapsed since the claim has accrued probably renders this a very inadequate return to the claimants for the loss of their property in 1854; but the act of Congress expressly prohibits us from allowing interest on any claim of this description, and to increase the damages because of that provision would be an unwarrantable evasion of the act of Congress. We think $6,000 was the fair value of the powder at Punta Arenas in 1854, when it was destroyed, and for that sum we render a judgment in favor of the claimants.