**CALTEX (PHILIPPINES), Inc. v. UNITED STATES.**

**SHELL CO. OF PHILIPPINE ISLANDS, Ltd. v. UNITED STATES.**

**STANDARD–VACUUM OIL CO. v. UNITED STATES.**

Nos. 48324, 48265, 48319.

United States Court of Claims.

Decided Nov. 6, 1951.

Leo T. Kissam and Albert R. Connelly, New York City (Cravath, Swaine & Moore, New York City, on the briefs), for the plaintiffs.

Kendall M. Barnes, Washington, D. C., Newell A. Clapp, New York City, Acting Asst. Atty. Gen. (Holmes Baldridge, Asst. Atty. Gen., on the brief), for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

Plaintiffs in these three suits, which have been consolidated, are The Shell Company of Philippine Islands, Ltd., Standard-Vacuum Oil Company, and Caltex (Philippines), Inc., hereinafter referred to as Shell, Standard, and Caltex, respectively. All are corporate entities which, at the time this cause arose, were engaged in the commerical distribution of petroleum products in the Philippine Islands area. Each of the plaintiffs maintained storage and

terminal facilities in the Pandacan District of Manila, P. I., and on the Island of Cebu.

All three oil companies are suing for just compensation for the taking of their terminal facilities at Pandacan (Findings 1 through 33).

Standard makes an additional claim for just compensation for petroleum products which were in its terminal at Cebu at the time the terminal was taken on December 8, 1941, by the depot commander in the name of USAFFE, and which were destroyed along with Standard's terminal on April 10, 1942. Standard is not making any claim for just compensation for the taking of its terminal facilities on Cebu (Findings 36 through 41).

Shell is suing for $3,943.20 for 131.44 metric tons of Diesel fuel oil sold and delivered by Shell, on or about April 3, 1942, to defendant at Cebu for use on United States Navy submarines. Defendant promised and agreed to pay the amount claimed but has not done so (Findings 34 and 35).

### Pandacan Claim

For several years prior to the outbreak of war with Japan, the United States Army had maintained detailed plans for the defense of the Philippine Islands. These plans recognized the need for large quantities of petroleum supplies in an extended defense effort. The Army did not possess adequate storage facilities of its own to carry on a full scale war effort. Rather, it procured its day-to-day petroleum requirements from the commercial oil companies and planned to rely upon their stored supplies in the case of an emergency. The oil companies were aware of and acquiesced in this plan, cooperating with the Army by maintaining certain stock levels so that the Army might be assured of adequate supply in case of sudden mobilization.

On December 7, 1941, war between the United States and Japan commenced at Pearl Harbor. Simultaneously, the Japanese attack on the Philippines got under way. The Army immediately commandeered quantities of motor transport, including vehicles belonging to the plaintiffs. On December 12, 1941, the Army took control of the operation of supply and disposition of petroleum products from the stocks on hand of the oil companies at their Pandacan terminals to the troops in the field. In the exercise of this control the Army used the land, buildings, fixed installations, equipment, containers, rolling stock, and personnel of the oil companies' Pandacan terminals (Finding 29). Army authorities kept track of the amount of petroleum products going to military users and organized the movements of petroleum to the field. It was understood that the Army would pay for all the petroleum taken for its own use. The Army also screened orders from civilian sources, allowing sales only to essential users such as the fire department, ambulances, etc. Measures were taken to safeguard the facilities by the use of troops, and the personnel of the oil companies remained on the job taking instructions from Army personnel.

An effort was made by the Army to negotiate temporary leases with the oil companies of their terminal facilities, but the press of the Japanese invasion did not allow time for the completion of such agreements before it became necessary to abandon Manila (Finding 20).

Until December 27, 1941, no officer in the Quartermaster Corps, United States Army, possessed authority, except to the extent that it was delegated to him by the commanding general, to commandeer or requisition the use or title of the stocks of the petroleum products, the land, fixed installations, equipment, supplies, or rolling stock of the oil companies on Pandacan. Such authority was not delegated by the commanding general to officers of the Quartermaster Corps on Pandacan except as described in Findings 13 to 20.

Between December 25 and 27, 1941, the oil companies were notified that their remaining stocks together with all terminal facilities were to be requisitioned and that whatever part could not be transported to the Army in the field was to be destroyed. Officials of the oil companies were reluctant to take the responsibility for destruction because of the imminent necessity of answering to the Japanese, and the Army agreed to take care of the demolition. On

December 27, 1941, the Army requisitioned all remaining petroleum stocks and all storage and handling facilities at the Pandacan terminals of the oil companies, and on December 31, 1941, in fulfillment of planned military policy, the terminal facilities and all products remaining therein were demolished by the Army for the purpose of denying their use to the Japanese.

The United States has paid plaintiffs for rolling stock requisitioned and for such of the petroleum stocks in the Pandacan terminals as were used by the Army. The United States also paid plaintiffs for the petroleum stocks which were in the terminals and were destroyed at the time of demolition. Defendant has refused to compensate plaintiffs for the loss of terminal facilities at Pandacan on the ground that these properties were taken on December 27, 1941, for the sole purpose of destruction in order to prevent their use by the enemy. The Government contends that such a taking is not compensable under the Fifth Amendment.

Plaintiffs base their claims for just compensation for the Pandacan terminal facilities upon the Requisition of Military Materials Act of October 16, 1941, 55 Stat. 742–43, as amended, 50 U.S.C.A.Appendix, §§ 721–724, and upon the Fifth Amendment to the Constitution, contending (1) that the terminals were taken for public use by the United States on December 12, 1941, and were used by the Government until destroyed on December 27, 1941, and (2) that if taken for the first time on December 27, 1941, and solely for the purpose of destruction to keep the terminals from the enemy, such a taking is compensable.

Inasmuch as this court must render a judgment for just compensation where there has been a taking by the United States of private property for public use on the basis of the constitutional requirement alone, no purpose is served in a discussion of the applicability of the statute in this instance, particularly as it is apparent that no effort was made to comply with that Act. The question of damages has been separated from that of liability under Rule 39(b) (1949 Reprint),[1] and accordingly the only question before the court is whether or not there was a taking of plaintiffs' terminal facilities on Pandacan[2] for public use for which the Government is required to make just compensation.

The plaintiffs contend that the Army's act of taking over the control of operation of supply and distribution on December 12, 1941, amounted to a "taking" of the terminal properties for use on that date and that such use continued until the moment of destruction on December 31, 1941.

From the record it appears that the officers in the Quartermaster Corps did not have authority to take title to plaintiffs' terminal facilities on Pandacan prior to December 27, 1941, and that no formal act of requisition took place until that date. Regarding the substance of the Army's acts as related in detail in the findings, and in the light of the situation known to exist, we do not believe that the control exercised by the Army between December 12, 1941, and December 27, 1941, amounted to a taking of plaintiffs' terminal facilities on Pandacan for public use. The Army control in this instance, all circumstances considered, seems no more complete to us than that exercised by Army meat inspectors in the Safeway[3] case. In that case it appeared that the Army representatives enforced Government set-aside orders, inspected and rejected meat at the slaughterhouse, regulated shipments, etc. Besides that, the Government, through other agencies, controlled the amount of beef slaughtered, the cuts prepared, and the prices charged. Later, the Government required Safeway to deliver to it certain portions of the beef set aside. We held the product to have been taken for public use, but it was never contended that the slaughter-

---

1. Under the new 1951 Rules, the applicable rule is 38(c), 28 U.S.C.A.

2. Standard's claim for just compensation for oil products alleged to have been taken from Standard's Cebu properties is also before the court under Rule 39(b),

1949 Reprint, new Rule 38(c), on the question of liability, and will be dealt with separately in this opinion.

3. Safeway Stores, Inc. v. United States, 118 Ct.Cl. 73, 93 F.Supp. 900.

house itself was taken. In that case, as in this,[4] the facility itself was subjected to regulations permissible under the Government's police and war powers, but was not taken for public use.[5] We have no doubt that the petroleum set aside for the use of the Army in the instant case was taken for public use. However, as the Government has paid plaintiffs in full for all the petroleum used and destroyed on Pandacan, this problem does not confront us.

We conclude that the Government's actions with respect to plaintiff's Pandacan terminal facilities between December 12, 1941, and December 27, 1941, did not amount to a taking of those facilities.

On December 27, 1941, the Government formally requisitioned the Pandacan terminals for destruction. By this date it was apparent that the area would have to be yielded to the enemy, and it had been determined that the terminals and their contents should be destroyed to deny them to the enemy. The Army took over the preparation for demolition and the actual demolition in part, at least, at the instance of the oil companies' representatives, who, understandably, did not want to answer to the Japanese for such an act. From December 27, 1941, to the moment of demolition on the afternoon of December 31, 1941, the Army had complete control of the premises and was engaged in removing petroleum to the field and in laying the demolition charges. On the latter date the entire terminal facilities were destroyed to deny their use and contents to the Japanese, who were by this time already entering Manila.

The only use the Army made of plaintiffs' terminal facilities following the requisition on December 27, 1941, was to destroy them. The plaintiffs claim that this destruction was such a public use as entitles them to just compensation for the destroyed terminals. Defendant's position is that governmental destruction of property in a time of great peril to prevent its falling into the hands of the enemy is noncompensable and that the loss must remain where it falls as one of the general ravages of war.

The courts of the United States have had little occasion to delineate the extent of the exception urged by defendant to the fundamental principle that the power of requisition in time of war is subject to the constitutional prohibition of the Fifth Amendment against the taking of private property for public use without just compensation. It has been made clear, however, that the war power conferred upon Congress by the Constitution does not abrogate this constitutional guaranty; it is not suspended or affected by war or the conditions following thereafter, nor is it subject to being taken away by statute. Generally, when private property is requisitioned or confiscated for war purposes, the owner thereof is entitled to, and the Government is obligated to pay just and full compensation therefor. See Annotation 137 A.L.R. 1290 and the cases cited therein. Further, it is settled that property to be compensable if seized need not be a specific interest or estate, but may amount only to an agreement covering an indefinite period. Portsmouth Harbor Land & Hotel Company v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287; United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311; Johnson v. United States, 2 Ct.Cl. 391.

Ordinarily, cases involving the question of just compensation under the Fifth Amendment involve the Government's exercise of its power of eminent domain or the question of whether or not some exercise of the Government's regulatory authority has amounted in law to a taking of another's property. The instant case is of a rarer type involving the seizure by the military authorities of property, the destruction of which is urgently required for the defense of the republic.

---

4. At least during the period from December 12 to December 27, 1941.

5. Cf. Aleutian Livestock Co., Inc. v. United States, 119 Ct.Cl. 326, 96 F.Supp. 626; Oro Fino Consolidated Mines, Inc. v. United States, 118 Ct.Cl. 18, 92 F.Supp. 1016; St. Regis Paper Co. v. United States, 110 Ct.Cl. 271, 76 F.Supp. 831, certiorari denied 335 U.S. 815, 69 S.Ct. 32, 93 L.Ed. 370.

The power of the military to seize and use property was upheld by the United States Supreme Court in 1851 in Mitchell v. Harmony, 54 U.S. 115, 14 L.Ed. 75. In deciding that case, Chief Justice Taney said, 54 U.S. at page 134:

"There are, without doubt, occasions in which private property may lawfully be taken possession of or destroyed to prevent it from falling into the hands of the public enemy; and also where a military officer, charged with a particular duty, may impress private property into the public service or take it for public use. Unquestionably, in such cases, the government is bound to make full compensation to the owner; but the officer is not a trespasser.

"But we are clearly of opinion, that in all of these cases, the danger must be immediate and impending; or the necessity urgent for the public service, such as will not admit of delay, and where the action of the civil authority would be too late in providing the means which the occasion calls for. It is impossible to define the particular circumstances of danger or necessity in which this power may be lawfully exercised. Every case must depend on its own circumstances. It is the emergency that gives the right, and the emergency must be shown to exist before the taking can be justified."

The Chief Justice's statement in Mitchell v. Harmony, supra, was essentially dictum because the action there had been against Mitchell, the military officer who had seized the property in question, as an individual.

In 1863, however, a case was presented to this court involving essentially the same question as is now before us. Grant v. United States, 1 Ct.Cl. 41, 2 Ct.Cl. 551. The plaintiff in that case, Grant, was a government contractor furnishing commissary and quartermaster supplies to the United States forts and military posts in Arizona. Grant maintained a flour mill, dwelling houses, storehouses, shops and corrals in Tucson, Arizona. The outbreak of the Civil War found the people of that city and state in open rebellion against the United States and few Federal troops in the area. Information came that Confederate troops were entering Arizona from Texas with the evident intent of cutting off the Union troops therein. Under this state of affairs orders were given and carried out for the removal of such military stores as could be transported and the destruction of such as could not be removed, together with such private property of Grant as might be of value to the enemy. At the time the property was put to the torch the Confederate flag was actually flying in the city of Tucson and the armed and rebellious citizenry were threatening immediate attack. Grant was ousted of possession a mere half hour before the destruction. Grant brought his suit in the Court of Claims and the Government interposed the defense heard here— that the destruction was noncompensable because of the law of overruling necessity.

In a learned and well-considered opinion, Wilmot, J., speaking for the court, held that the destruction of Grant's property to deny it to the enemy's use was a taking for public use for which compensation must be made under the Fifth Amendment. In the course of its opinion the court cited with approval the major treatises written on the subject, Ibid., 1 Ct.Cl. at page 44:

"The damages under consideration are to be distinguished into two kinds—those done by the State itself or the sovereign, and those done by the enemy. Of the first kind, some are done deliberately and by way of precaution, as when a field, a house, or a garden, belonging to a private person, is taken for the purpose of erecting on the spot a town, a rampart, or any other piece of fortification; or where his standing corn or storehouses are destroyed to prevent their being of use to the enemy. Such damages are to be made good to the individual, who should bear only his quota of the loss (Vattel, 403).

"We must observe this, that the king may in two ways deprive his subjects of their right, either by way of punishment or by virtue of his eminent power. But if he do so in the last way, it must be for some public advantage, and then the subject ought to receive, if possible, a just satisfaction for the loss he suffers out of the common stock (Grotius, b. 2, ch. 14, sec. 7).

"The State has an eminent right of property over the goods of the subjects, so that the State or those that represent it may make use of them, and even destroy and alienate them, not only on extreme necessity, but for the public benefit, to which we must add that the State is obliged to repair the damages suffered by any subject on that account out of the public stock (Grotius, b. 3, ch. 20, sec. 7)."

The court then disposed of the argument that the state possessed the right to destroy property because of overruling necessity by pointing out that the right to destroy another's property under the pressure of overbearing necessity, and to be free of liability for the act, is an ancient natural right as between individuals. The court concluded that the rights of self-defense and of self-preservation have no connection with the state's right of eminent domain. The latter right is limited by the Constitution—the former are beyond its reach.

The court went on to point out that the denial of sustenance to the enemy was of nearly as great importance as providing sustenance for one's own army, and that a destruction of another's property to deny it to the enemy was as much a public use as if it had been consumed by friendly troops in battle. The dictum of Chief Justice Taney in Mitchell v. Harmony, supra, was cited as evidence of Supreme Court approval of this doctrine.

Wiggins v. United States, 3 Ct.Cl. 412, approved the doctrine of the Grant case, following it in a similar case involving the destruction of black powder belonging to an American citizen living abroad in a friendly country, to keep the powder from falling into the hands of certain Central American banditti then engaged in hostilities against the United States. The view taken by the Court of Claims was approved and applied by Judge, later Justice, Holmes in Miller v. Horton, 152 Mass. 540, 26 N.E. 100, 102, 10 L.R.A. 116. To our knowledge, no case directly involving the point in question here has been decided in the courts of the United States since the Grant and Wiggins cases. Certain cases decided in this court under the Bowman Act, 22 Stat. 485, contained dicta indicating that if the question had been then presented to the court, a contrary result might have been obtained. See Walker v. United States, 34 Ct.Cl. 345; Presbyterian Church at Murfreesboro v. United States, 33 Ct.Cl. 339. At least one of these cases reached the Supreme Court, and the opinion handed down therein is today the chief reliance of the defendant. That was the case of United states v. Pacific Railroad, 120 U.S. 227, 7 S.Ct. 490, 30 L.Ed. 634. Like Mitchell v. Harmony, and, indeed, all the authorities upon the point except the Grant and Wiggins cases, the language applicable to the instant case is dictum. And the dictum is contrary to the dictum in Mitchell v. Harmony and to the holdings of the Grant and Wiggins cases. The Pacific Railroad case involved the following factual situation. The Union armies, in retreat, had destroyed certain of the plaintiff railroad bridges. Later in the war, as the Union armies advanced, it became a military necessity that the bridges be immediately restored to use. The railroad company was not in a financial position to rebuild at the moment, and the Government rebuilt the bridges on the railroad's right-of-way. Later, the Government withheld from freight charges it owed the railroad the cost of rebuilding the bridges, claiming that the bridges were destroyed as an incident to the military campaign; that the loss to Pacific Railroad was noncompensable; and that, having built the bridges for the railroad and they having been accepted and used, an implied promise of repayment arose. The court found against the Government on the ground that the railroad was under no duty to rebuild and that no implied promise to pay grew out of the Government's construction of the bridges to further the war effort. It was held that the bridges, having been constructed upon the land of the railroad, adhered to the realty and that Pacific Railroad took title thereto without obligation to repay the construction costs. Justice Field, who delivered the opinion of the court, gratuitously went into the question of whether or not Pacific Railroad could have recovered had it been suing for the value of its destroyed bridges. It was stated

that the railroad could not have recovered and that, "Whatever would embarrass or impede the advance of the enemy, as the breaking up of roads, or the burning of bridges, or would cripple and defeat him, as destroying his means of subsistence, were lawfully ordered by the commanding general. * * * The safety of the state in such cases overrides all considerations of private loss." Ibid., 120 U.S. at page 234, 7 S.Ct. at page 493. As authority for this position Justice Field cites Vattel, several state court cases, and the proceedings upon certain bills before Congress for the relief of citizens suffering war losses.

The citation from Vattel, Ibid., 120 U.S. at page 234, 7 S.Ct. 490 is the same as that relied upon by Wilmot, J., in the Grant case and includes the statement that where a citizen's standing corn or storehouses are destroyed to prevent their being of use to the enemy just compensation must be made. Of the state court cases relied upon, Respublica v. Sparhawk, 1 Dall., Pa., 357, 1 L.Ed. 174, involved property destroyed by the *enemy;* Parham v. Justices of the inferior court, 9 Ga. 341, involved injunctive relief; Taylor v. Nashville & Chattanooga Railroad, 46 Tenn. 646, involved the *legality* of destruction, Cf. Mitchell v. Harmony, supra; New York, Mayor, etc. v. Lord, 18 Wend., N.Y., 126, involved the construction of a statute and the question of whether or not there had been compliance.

The subject-matter of the bills before Congress discussed by Justice Field do not involve the issue here. The first was the case of a citizen's home burned while in possession of the enemy. Clearly, such a destruction is not compensable. Juragua Iron Co. v. United States, 212 U.S. 297, 29 S.Ct. 385, 53 L.Ed. 520. Another involved a citizen's property damaged by water from a levee breached to impede the advance of enemy artillery. This is a case of damage incidental to the actual battle. A state has never been held liable for the consequential damages that fall upon occupants of the battle area due to the clash of arms. Such losses are those of chance alone, comparable to losses sustained as the result of an unavoidable accident. Cf.

Perrin v. United States, 4 Ct. Cl. 543. The instant case, on the other hand, deals with private property not in the hands of the enemy, yet singled out for deliberate destruction.

The third congressional action involved a bill to compensate a citizen for his house which had been taken by the enemy, recaptured, and then destroyed to deny the enemy the possibility of recapture. The question actually involved was whether or not the house had been destroyed in the course of the battle. The latter interpretation was the President's, Cong. Globe, 42nd Cong., 2d Sess. 4155 (1872) and, although a majority of the Congress disagreed with him, the bill died under the veto.

The Pacific Railroad decision does not mention the Grant and Wiggins cases, but cited with approval Mitchell v. Harmony, supra, with no mention of its contrary dictum.

It is obvious from the language of the foregoing cases upon which the parties rely that the distinction between cases where property may be destroyed without liability because their destruction was an incident of battle, and cases where the owner of property destroyed must be compensated is somewhat less than clear cut. We are of the opinion, however, that the reasoning of the Grant case, where the court necessarily met the very issue involved here and considered it fully, together with Chief Justice Taney's dictum in Mitchell v. Harmony, present sounder precedents upon which to found our decision today than does the dictum of the Pacific Railroad case.

■■■ The United States Government was organized as a government of limited powers under a written constitution. One of its purposes was declared to be to "provide for the common defence" *(sic)*. To effect this end, Congress was empowered to raise funds by a system of taxation uniform throughout the states, to maintain an army and a navy, and to declare war. Throughout the history of the Republic, it has been recognized that the Federal Government, being charged with the common defense, must call upon the citizenry of the

country for common sacrifice of life and treasure in that defense. It has been a fundamental principle, however, that the burden to be met should be distributed among the people as uniformly as practicable. The costs of war are not met alone by volunteers. A system of taxation spreads the financial burden among all the inhabitants according to their ability to pay—dissenters, slackers, and even aliens must contribute. When it becomes necessary to call upon the nation's manhood for personal service in the armed forces, that burden, which may call for the contribution of life itself, is distributed as uniformly as possible throughout the qualified men of the nation, the impartial hand of chance being employed to select specific individuals from the qualified classes. The Government does not attempt to insure its citizenry against losses due to the ravages of war inflicted by our own or enemy forces in the conduct of a campaign. But when it is determined that a specific person's property because of its nature or location is so essential to war effort that it must be taken and put to use for the good of the nation, it is our belief that the public generally should bear the cost of acquisition. Ordinarily, time is not so much of the essence but that the ordinary procedures of eminent domain under civilian control are followed and just compensation determined and awarded as a matter of course. At times, however, the emergency may be so great and the time so short that an officer of the Government is justified in impressing the property summarily into service. Because the impressment is summary and dictated by immediate necessity would not seem to make it less an exercise of eminent domain. The Constitution provides that funds for the common defense shall be raised by a uniform method of taxation; it provides also that the owner of private property taken for public use—and the common defense is a public use—shall be justly compensated.

▮ It appears to us that the destruction of the Pandacan terminals was a use thereof in the common defense and that a taking of plaintiffs' property for that purpose without making compensation therefor would be as much a violation of the Constitution as would a tax directed solely at a named individual.

The nearness of the enemy and the causes necessitating the destruction, we feel, made the Army's action lawful and may have a bearing upon the question of damages, see dissenting opinion of Loring, J., in Grant v. United States, 1 Ct.Cl. 41, 2 Ct.Cl. 551, but we do not believe that it made the action other than an action of eminent domain for which plaintiff is entitled to just compensation.

We are aware that our decision, on its face, appears contra, to certain principles of the common law. In Bowditch v. City of Boston, 101 U.S. 16, 18, 25 L.Ed. 980, it was said:

"At the common law everyone had the right to destroy real and personal property, in cases of actual necessity, to prevent the spreading of a fire, and there was no responsibility on the part of such destroyer, and no remedy for the owner. In the case of the Prerogative, 12 Rep. 13, it is said: 'For the Commonwealth a man, shall suffer damage, as for saving a city or town a house shall be plucked down if the next one be on fire; and a thing for the Commonwealth every man may do without being liable to an action.' There are many other cases besides that of fire—some of them involving the destruction of life itself—where the same rule is applied. 'The rights of necessity are a part of the law.' Respublica v. Sparhawk, 1 Dall. [Pa.] 357, 362 [citing further cases]."

\* \* \* \* \* \*

"The statute of Massachusetts, as far as it goes, gives as a bounty that which could not have been claimed before."

▮ The Bowditch case involved, as concerned the Commonwealth of Massachusetts, a somewhat similar state of affairs as is presented here. The statute referred to provided compensation for a home owner whose house was destroyed under certain circumstances to prevent the spread of fire. It was recognized that the statute gave a right of action not cognizable at common law. In the instant case we are bound by the Fifth Amendment to the Constitution

to recognize plaintiffs' right under that Amendment irrespective of the English common-law precedents. Justice Holmes has, indeed, expressed the thought that such cases have perhaps stood as much upon tradition as upon principle. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 416, 43 S.Ct. 158, 67 L.Ed. 322. As pointed out in Grant v. United States, supra, the doctrine of absence of liability for a destruction dictated by overriding necessity may still have validity in this country as applied to individuals, but the power of the Federal Government, derived from and limited by the Constitution does not extend to the deliberate destruction of an individual's property for the common cause without the payment to the owner of just compensation.

We conclude that the Government is liable on plaintiffs' claim for just compensation for the destruction of their Pandacan terminal facilities.

### Cebu Claim

In case No. 48319 plaintiff, Standard-Vacuum Oil Company, seeks to recover just compensation for the value of certain petroleum products destroyed on or about April 10, 1942, on the Island of Cebu to deny their use to the Japanese.

In addition to the Pandacan terminal at Manila on the Island of Luzon, Standard, Caltex, and Shell, each owned and operated terminals on the Island of Cebu. In November 1941, the Chief Quartermaster, USAFFE, arranged for the dispatch of an officer of the Quartermaster Corps to Cebu to establish and command an advance Quartermaster Depot. This Depot Commander was authorized and directed to procure supplies for USAFFE, including petroleum products, for use in the southern islands of the Philippines. He was authorized to exercise his discretion as to the manner of procurement. USAFFE had no bulk stocks of petroleum products in or near Cebu and only a negligible amount in drums. It had been decided at USAFFE headquarters not to send supplies of petroleum products from Manila to Cebu. The only petroleum supplies in the Cebu area were those of the three oil companies.

Cebu is an island in the Philippine chain, located some 350 miles southeast of Manila.

On December 8, 1941, the Cebu Depot Commander, pursuant to his authorization mentioned above, called a meeting of the representatives of the three oil companies and informed them (1) that in the name of USAFFE he was taking over all their supplies of petroleum products and (2) that he was freezing the price of such products at the current Army contract rate. He stated that the oil companies would be permitted to take out a certain amount of stock from their terminals for the use of the local government on Cebu and for such civilian agencies as were essential to the Island's economy.

Within a few days after December 8, the Depot Commander had established complete control over the oil companies' terminals and had stationed military patrols thereon. He issued an order that no petroleum products could be withdrawn without approval by him or his authorized representative. Work was begun on the packaging of petroleum products in tins or drums and the removal of such products for use or for dispersal to warehouses and supply dumps for protection against possible enemy bombing.

Records were maintained of the amounts of petroleum stocks removed and the amounts on hand at the terminals. Petroleum products released to civilians or for civilian purposes were recorded as stock credits against the amount initially taken by and for the Army under the above-mentioned requisition. The oil companies were permitted to charge for the amount so released at prices prevailing for local civilian use.

On April 10, 1942, the oil companies' terminals and the petroleum products remaining in them were destroyed by order of the Depot Commander, pursuant to a demolition plan, to prevent the facilities and supplies from falling into the hands of the enemy. Japanese forces were then in the harbor and began their landings on Cebu within hours after the demolition.

Defendant has paid Standard for the petroleum products removed from Standard's Opon terminal for use or dispersal by

the Army, but has refused to pay for the petroleum products which remained in the terminal and were destroyed with it on April 10, 1942.[6] The products so remaining and so destroyed had been on hand on December 8, 1941, at the Opon terminal when the Army Depot Commander requisitioned all of Standard's petroleum products in the name of USAFFE.

It is the Government's contention that there was no taking of Standard's Cebu petroleum products on December 8, 1941, and that the action of the Depot Commander amounted merely to the establishment of a priority system for Standard's petroleum products. Accordingly, the Government concludes that if there was any taking at all it was a taking on April 10, 1942, for the sole purpose of destruction in the same manner that the Government took the Pandacan facilities on December 27, 1941.

Unlike the somewhat confused situation on Pandacan in December of 1941 relative to the authority of Quartermaster officials to requisition private property, the Quartermaster Corps official at Cebu was given authority in November of 1941 to procure supplies for USAFFE, including petroleum products in any manner he found expedient. On December 8 the Depot Commander actually requisitioned these products. These facts are found by the Commissioner in Findings 37 and 38 and were not excepted to by defendant. The Depot Commander's actions permitting the oil companies to take out a certain amount of their stock for the use of the local government and their civilian agencies, subject to the approval of the Depot Commander, were not inconsistent with an act of taking or requisition. As of December 8, 1941, when the Army took title to the petroleum products in Standard's Opon terminal, it did not take them for destruction. It took them and used them for approximately four months. The products which were destroyed by the Army on April 10, 1942, had been in existence and

in the Opon terminal on December 8, 1941, the date of taking.

We conclude that the Depot Commander, with full authority to do so, took Standard's petroleum products for the United States on December 8, 1941, not for destruction, but for use, and Standard is clearly entitled to just compensation for its products so taken.

### Shell Contract Claim

On or about April 3, 1942, Shell sold and delivered to defendant at Cebu, for use on United States Navy submarines, 131.44 metric tons of Diesel fuel oil, for which defendant promised and agreed to pay the sum of $3,943.20. The parties have agreed that Shell (case No. 48265) is entitled to judgment in the sum of $3,943.20 and judgment for this amount will be entered in favor of Shell.

Caltex, Standard and Shell are entitled to recover for the taking of their terminal facilities on Pandacan, and Standard is entitled to recover for the taking of its petroleum products on Cebu, the exact amounts being reserved for further proceedings under Rule 38(c).

It is so ordered.

MADDEN and LITTLETON, JJ., concur.

JONES, Chief Judge (dissenting in part).

There are times when age-old, time-honored principles of law seem to meet head-on in hopeless conflict.

It is written that private property may not be taken for public use without just compensation.

On the other hand it is well recognized that property destroyed in actual battle by either side does not call for compensation. It is held that all property and human rights may be the victim of battle conditions. If the battle is lost all may be lost.

Between the application of these two recognized principles is a twilight zone

---

6. Standard's Cebu installation, known as the Opon terminal, included oil storage tanks, pipe lines, pumping equipment, dock facilities, warehouses, can-making machinery, containers, and supplies of petroleum products. Only the supplies of petroleum products are in issue in Standard's Third Amended Petition. Shell and Caltex have not made any claim with respect to their Cebu properties in this proceeding.

the boundaries of which are difficult to determine. The differences are factual rather than fundamental.

In this uncertain zone that cannot be measured by a mathematical yardstick the facts of this case fall.

Were plaintiffs' permanent installations taken for public use or was the destruction the inevitable result of substantial battle conditions?

The defendant has seen fit to admit that the vehicles, the gasoline, and movable articles were taken and has paid for them or admitted liability, but insists that the buildings and permanent fixtures fall in a different classification.

In United States v. Pacific Railroad, 120 U.S. 227, 7 S.Ct. 490, 30 L.Ed. 634, Mr. Justice Field gave extended consideration to the question now before this court. That case arose out of the destruction of railroad bridges by Federal armies during the Civil War; the bridges were destroyed to impede the advance of the enemy. Later, again in response to military necessity, the bridges were rebuilt by the United States. The United States sought to charge the railroad for the cost of rebuilding by withholding that amount of money due the railroad for transporting passengers and freight. The railroad sued for the full amount of the transportation charges. The Court decided that it was entitled to recover that amount. Recovery, however, was not based on the Fifth Amendment. The destruction created no cause of action in the railroad; neither did the rebuilding create a cause of action in the United States; both were dictated by military necessity. Where the parties were left by the fortunes of war, there they were left by the Supreme Court.

At page 239, of 120 U.S., at page 496 of 7 S.Ct: "While the government cannot be charged for injuries to, or destruction of, private property caused by military operations of armies in the field, or measures taken for their safety and efficiency, the converse of the doctrine is equally true, that private parties cannot be charged for works constructed on their lands by the govern-ment to further the operations of its armies."

The Pacific Railroad opinion was a careful and deliberate attempt to sum up the legal consequences of destruction of private property pursuant to the dictates of military necessity. Mr. Justice Field's discussion of whether the railroad could have recovered in an action for compensation for the destruction of the bridges was not strictly necessary to disposition of the issue in the case. But it cannot be dismissed as merely gratuitous. As he viewed the case, a proposition and its converse were both involved and both had to be discussed. If not decisive of the issue now before us, his discussion is at least strongly persuasive. It has persuaded me that the demolition of the Pandacan facilities in World War II was, like the destruction of the railroad bridges in the Civil War, a destruction of private property "during war, by the operations of armies in the field, or by measures necessary for their safety and efficiency * * *." Ibid. If the railroad bridges were not "taken for public use", then neither were the oil terminal facilties at Pandacan. Admittedly, the question now before us was not as squarely presented in Pacific Railroad as in Grant v. United States, 1 Ct.Cl. 41, 2 Ct.Cl. 551. But the Supreme Court in Pacific Railroad was not unaware of the Grant case. That case as well as Wiggins v. United States, 3 Ct.Cl. 412, had been cited in the railroad's brief to the Supreme Court. These early Court of Claims cases did not sway the Supreme Court in 1887; I do not believe they should sway us now.

The majority has stated: "The Government does not attempt to insure its citizenry against losses due to the ravages of war inflicted by our own or enemy forces in the conduct of a campaign. But when it is determined that a specific person's property because of its nature or location is so essential to war effort that it must be taken and put to use for the good of the nation, it is our belief that the public generally should bear the cost of acquisition." With that statement I agree. It is with its application that I quarrel. I think it has been applied here in a most unrealistic way.

I think we have here not a case of taking and putting to use of property but rather a case of property destroyed in the conduct of a campaign.

While controls were thrown around the property in question on December 12, 1941, the actual notice of taking was not given until December 28, and it was then made clear that it would be destroyed. At that time the Japanese were at the outskirts of the city of Manila. There was no hope of saving the property. If the city were further defended, the property would undoubtedly be destroyed. If it fell into the hands of the Japanese it would certainly be destroyed before they gave it up. In fact, practically all Manila, residential and otherwise, was destroyed in the process of retaking three years later. Any possible value to the plaintiffs was gone whichever horn of the dilemma is taken.

The situation was hopeless from a military viewpoint and the army was withdrawn to Corregidor. The property was so near to the battle zone border as to be for all practical purposes within its flaming presence if not actually in it.

The Pandacan installations were demolished almost at the very moment before retreat. The demolition was a defensive action, and an important one. As such, it was inextricably a part of the tragic battle then taking place on the island of Luzon. I do not know how to disassociate that action from the pattern of the battle. I think an appreciation of the realities of the situation requires us to hold that plaintiffs' properties were destroyed in the course of that battle.

The demolition occurred on December 31, 1941. By January 2, 1942, Manila was under Japanese control. Had the oil terminal facilities fallen intact to the enemy and thereafter been destroyed by United States forces, by bombing, shelling, or other military action, admittedly plaintiffs would have no claim for compensation. Nor would they have a claim for compensation if the enemy had destroyed the property. Of course, had we waited until Manila fell to attempt to destroy the installations, it is not likely that the destruction would have been as effective. Our forces chose the surer

mode and time of destruction. The deliberateness of this choice, the fact that plaintiffs' properties were singled out for destruction, seems to have influenced the majority's conclusion that the destruction was a Fifth Amendment taking. I think, however, that it only emphasizes the military nature of the destruction.

This court has been zealous in upholding the force of the eminent domain provision of the Fifth Amendment. We have not been unmindful of the principle that the Amendment is not suspended in time of war, and I do not propose that we should be. However, a scrupulous regard for the Amendment does not require us to ignore the realities; it does not require us to say that property destroyed by military action was "taken for public use." I think that the loss for which compensation is sought here, considered in its context of time and place, must be regarded in law as what it was in fact—a loss incident to battle, a loss in the words of the majority's opinion, "inflicted by our own or enemy forces in the conduct of a campaign."

The law is based on reason. It is based on human experience. It is the result of centuries of effort on the part of the brightest minds, both legislative and judicial, to secure rules of action that will assure justice in disputes between individuals as well as between citizen and government.

Applying the rule to a very difficult situation we are unable to find within the range of reason any just ground for allowing compensation for the permanent installations. It was one of the darkest periods of World War II. The Japanese advance at that time seemed irresistible. Shells were bursting in the city. Within a matter of hours everything would have been in the hands of the enemy and our outnumbered army captured or destroyed, had it not been withdrawn to Corregidor. I can reach no other conclusion than that the destruction was due to battle conditions.

I dissent from the decision that plaintiffs' properties were taken for public use within the meaning of the Fifth Amendment.

I would allow the Shell Company of Philippine Islands, Ltd., to recover the sum

of $3,943.20 for products sold and delivered to defendant at Cebu, and which have not been paid for. I would dismiss the other claims of each of the plaintiffs.

WHITAKER, J., joins in the foregoing dissenting opinion.