Arpod J. **ARTWOHL** et al.,

v.

The **UNITED STATES.**

No. 151–66.

United States Court of Claims.
Dec. 11, 1970.

William C. Craft, Washington, D. C., for plaintiffs. Thomas H. King, Washington, D. C., attorney of record for plaintiffs.

George M. Beasley, III, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

NICHOLS, Judge.

Plaintiffs herein claim just compensation under the Fifth Amendment for an alleged taking of their property by the United States. The property allegedly taken is the "excess profits" from the duty-free sale of private automobiles in Brazil by the plaintiffs pursuant to a diplomatic privilege. The commissioner found for the plaintiffs. We reverse.[*]

Plaintiffs are members of the U.S. Armed Forces who at the time of the transactions here involved were assigned to the Joint Brazil-United States Military Commission, (JBUSMC) in Rio de Janeiro, Brazil. Coincident with this assignment was the privilege afforded them as if they were diplomatic personnel, for duty-free importation of automobiles for personal use during the tour of duty. As a result of international Executive agreements, Brazilian law and the embassy regulations permitted the duty-free sale of automobiles so imported in certain enumerated circumstances. The most common occurrence which

---

[*] Commissioner S. R. Gamer's recommended conclusion of law was that plaintiffs were entitled to recover. While we disagree with that conclusion, the court acknowledges the assistance it has derived from the commissioner's able opinion and thorough findings of fact.

qualified a car for sale was the passage of two years following the date of importation. The prevailing market in Brazil was such that a sale would bring a price two or three times that originally paid for the car; obviously a considerable windfall for the seller. The findings show the scope of this business: U.S. personnel sold an average of one of these duty-free cars to a Brazilian buyer every working day, at profits of up to $3,000 per sale. Since the same car, if transported back to the United States would be worth only a fraction of its original cost, the practice was to sell the car on the Brazilian market upon completion of a tour of duty.

Similar conditions prevailed in other Latin American countries. Americans were able to recover these generous profits only by virtue of their diplomatic privilege, and the damage believed done to the American image by this "profiteering" became an object of serious concern to senior State Department officials. This concern took the form of action after an incident involving two Foreign Service officers resulted in very unfavorable local publicity. *See* Finks v. United States, 395 F.2d 999, 184 Ct.Cl. 480, cert. denied 393 U.S. 960, 89 S.Ct. 398, 21 L.Ed.2d 374 (1968). The action taken was a change in the regulations so that in order to take advantage of a duty-free sale, the seller had to agree to accept no more than his original cost plus expenses, with the excess going to a charity of his choice. It is this excess amount which plaintiffs charge was unconstitutionally taken.

At the time plaintiffs imported their automobiles into Brazil, Embassy Instruction 103 of May 11, 1962 was the controlling directive, both for policy and procedure, in regards to duty-free importation and sale. The preamble to this directive set the tone for all such transactions and bears repeating here:

By Executive Order of the President, the Ambassador is charged with the responsibility of exercising full and complete control over the importation, use and disposition of all items, whether of great or small value, which are brought into the country duty-free by or on behalf of the United States citizen who is in Brazil and enjoys duty-free privileges because of his relationship to the United States Government. The Ambassador's control extends to importations by the individual whether or not freight costs are covered by the Government, to the purchases made by and through liquor pools, Commissaries, Post Exchanges, and to items received through military postal facilities, diplomatic pouches and international mail, and to items brought in as accompanied or unaccompanied baggage and on US military aircraft and vessels.

All duty-free importations or purchases accomplished via any means must, without exception, be intended for the personal use of the individual concerned, and under no circumstances may a duty-free importation or purchase be accomplished with the intent on the part of the individual concerned to give, loan, sell or otherwise release such imported items to any person, persons or organization, or to allow the use of his name for such purpose. Sale may be authorized when related to a permanent departure from Brazil for which specific regulations are prescribed elsewhere in this Circular. Infractions of this basic rule of international usage can jeopardize our entire structure of privileges in the country and will be viewed as a serious breach of discipline which the Ambassador could not possibly ignore.

At the present time there are over 1,200 Americans serving in Brazil representing various civilian and military Agencies of the United States Government. We are the largest single organization in the country which receives duty-free privileges for each American staff member. It is imperative that each and every individual, as a guest in Brazil, conduct himself in such a manner so as to be free from any breath of suspicion concerning improprieties in any aspect of his life in Brazil, and particularly with regard to his duty-free privileges. The Brazilian Government is much con-

cerned with this question and scrutinizes each and every duty-free importation so carefully that delays in clearance are inevitable. Our efforts to expedite and streamline the clearances have had limited success because of the Brazilian Government's serious concern. The following rules and regulations, which shall be observed by each and every individual entitled to free-entry privileges, are designed to inform all concerned of the procedures to be followed in accomplishing duty-free purchases or importations, and to afford the Ambassador the means for the necessary control.

Paragraph V(2) contained the following language in reference to JBUSMC personnel:

> Civilian and military personnel attached or assigned to the Joint Brazil-United States Military Commission are eligible for the same duty-free privileges and are subject to the same rules and regulations stipulated herein, and shall make all applications for importations, purchases or disposals to the Secretary of the United States Delegation as prescribed by JBUSMC instruction.

JBUSMC Regulation 200–3 of 15 May 1963, was then published to implement Embassy Instruction 103. Paragraph 7c was entitled, Procedure For Selling Duty-Free Automobiles, and read, in part, as follows:

> (1) Request for permission to sell an automobile will be submitted to the Senior Officer, Service concerned, through the Secretary, U. S. Delegation, JBUSMC * * *.
>
> (2) The Secretary, * * *, will review the request and if it is determined that it meets the criteria for sales, as stated in these Regulations, he will forward it to the Senior Officer, service concerned, recommending approval.
>
> (3) After approval by the Senior Officer, service concerned, the request will be returned to the Secretary, * * *, who will prepare and forward appropriate letters

to the Brazilian authorities. Nothing contained in these Regulations will be deemed to prohibit the Senior Officer, service concerned, from disapproving a request even when the automobile meets all sales criteria of these Regulations.

> (4) When approval is obtained from the Brazilian authorities, seller will be notified by the Secretary, U.S. Delegation, JBUSMC.

   *     *     *     *     *     *

Following notification of approval by Brazilian authorities, the seller was then free to find his own buyer.

Plaintiffs admit that prior to importing their vehicles, they were advised of the then existing laws and regulations of Brazil and the United States which governed the duty-free sale of such vehicles while in Brazil. Indeed, the message from the quoted documents is clear that such importation and sale was a privilege to be enjoyed only as it did not detract from the image of the United States mission to Brazil. Local Brazilian law granted the privilege of selling automobiles imported duty-free under certain express conditions. However, the exercise of this privilege was carefully controlled by the Ambassador. No American diplomatic personnel could directly approach the Brazilian officials for authority to sell. Permission had to be obtained from the proper American officials who, if approval were granted, would then clear the transaction with the Brazilians. That approval was generally granted as a matter of routine could not transform this privilege into a vested right. As evidenced by JBUSMC 200–3, the "Senior Officer, service concerned" could disapprove the request by the individual even though all the requirements of Brazilian law had been met. Even when sale was authorized, the manner of sale was likewise subject to the control of the Ambassador. Embassy Instruction 103 directed that, "personnel shall avoid undignified sales practices such as auctions or 'fire sale' type of advertisement and in advertising, the

employee shall not identify therein the United States Government or any Agency thereof."

It is noteworthy that while these same policies and regulations were in effect, at least one member of JBUSMC was apparently denied permission to sell an automobile because his acknowledged motives for importing the car were not in keeping with the policy expressed in the preamble to Embassy Instruction 103, quoted *supra*. Paragraph III 2(c) of this directive provided:

Vehicles in the country less than one year may not be sold except to duty-free persons, subject to Embassy and Ministry approval, or must be exported from Brazil. Exceptions to this rule are in the event of death of the employee/owner or retirement, with permanent departure from Brazil of the employee retiring from Government service. * * *

Citing this paragraph and his pending retirement, an Air Force enlisted man forwarded a request for authority to import a new car in November, 1964, and in the same document requested permission to sell it at his retirement in August, 1965. (DF Exhibit 58.) The response from the Embassy official charged with ruling on such a request was (DF Exhibit 59), as follows:

We have reviewed carefully your memorandum of August 12 and * * attached request for the importation and later sale of an automobile.

Embassy Instruction No. 103 dated May 11, 1962 states that "All duty-free importations or purchases accomplished via any means must, without exception, be intended for the individual concerned, and under no circumstances may a duty-free importation or purchase be accomplished with the intent on the part of the individual concerned to give, lend, sell or otherwise release such imported items to any person, persons, or organizations * * *"

It would appear from * * * application for import of a new automobile that his purpose is as much to have a car to sell upon retirement as it is to have transportation for the balance of his tour here. Approval of * * * request would therefore be contrary to the letter and intent of Embassy Instruction No. 103.

[The applicant] appears to be eligible to import an automobile for his own use. Should he wish to import a car for the balance of his tour with the express understanding that he will not be authorized upon his departure to sell it, but must take it out of the country, he should submit a corrected application for our approval.

During cross-examination at the trial, one of the plaintiffs responded to questions regarding this incident with the statement that, "the honest, hardworking soldier who lays down the truth and honesty, he gets clobbered all the time. The big-time operator who is looking for all the angles, he gets away with murder all the time."

The State Department, at the instance of the National Security Council, had since 1958 been devoting considerable study to these matters and their effects on the American image in the countries concerned. On September 1, 1964, following the incident described in *Finks*, *supra*, William J. Crockett, Deputy Under Secretary of State for Administration, issued the following memorandum to various State Department officials:

In many countries United States Government employees are making enormous profits by selling their automobiles on the local economy. Not only do I find this unethical, but I believe it diminishes the stature of the American mission abroad.

We do not pay for the transportation of employee's automobiles so that they may eventually take advantage of the economic plight of the host country. Profiteering never was intended to be a motive for duty abroad. Moreover, the situation is exacerbated in certain countries by the fact that employees of certain agencies can im-

port cars while employees of other agencies cannot.

One solution would be to determine the countries where abnormal profits are being made and to authorize the Ambassador to forbid all *American Government employees* from selling their cars at the completion of a tour of duty. Another possibility would be to allow the sale of the car at the U.S. book value taking into consideration higher cost of maintenance, etc. I personally favor the former solution although it admittedly would result in higher transportation costs per employee; the latter solution, while more economical to the Government, appears to be open to chicanery and circumvention.

A third possibility would be to require the excess profits to be turned into the Embassy. Some of these funds could be put back into local charities and schools and a portion could be put into an Embassy recreation fund.

Any comments?

On February 4, 1965, the State Department published Foreign Affairs Manual Circular No. 281 (FAMC 281) with the stated purpose:

> * * * to prohibit the sale of personal automobiles and other personal property, of American employees abroad at prices producing profits that result essentially from import privileges derived from their official status * * *.

This directive, applicable worldwide, prohibited the sale by diplomatic personnel, "at an amount in excess of the price he paid for it plus any taxes and customs paid by him, or for any valuable consideration in excess of the total of these amounts."

Each Ambassador was given authority to issue "detailed local regulations and procedures tailored to meet unique local situations."

These regulations, of course, had no effect on the local market, and if the Americans were not allowed to sell at a greater price than cost, evidently the Brazilian buyers would fall heir to the windfall profits. Such a situation would have been conducive to the "chicanery and circumvention" anticipated by Under Secretary Crockett, *supra.* An alternative was to require the employee to ship his car back to the United States at the conclusion of his tour of duty. However, in view of the inconvenience to the individual concerned and the fact that the cost of transportation was often greater than the value of the car on the American market, this latter alternative was considered undesirable.

In order to avoid any of the consequences related above, Ambassador Lincoln Gordon, with the approval of the State Department, published Embassy Instruction No. 188 of May 20, 1965. Paragraph V of that directive was entitled, Conditions for Disposition of Vehicles in Brazil under FAMC 281, and read as follows:

A. *Options*

The owner of the vehicle imported free of duty has the following options in disposing of the vehicle:

(1) Export the vehicle from Brazil, at government expense if eligible;

(2) Sell the vehicle * * * to another person enjoying duty-free privileges;

(3) Pay Brazilian duties and taxes, thus freeing the vehicle for sale subject to approval of Brazilian authorities;

(4) Sale *to* the Foundation. The seller will receive only an amount consonant with the provisions of FAMC 281. In such a case the seller will be given a statement by the Foundation which will indicate the exact amount received;

(5) Sale *through* the Foundation. The seller will receive only an amount consonant with the provisions of FAMC 281. He may designate, if he wishes, the charity to which any excess proceeds are to be paid. The seller will be

given a statement by the buyer showing the full amount paid for the vehicle and he may be subject to the payment of a capital gains tax.

B. *Foundation*

(1) A charitable Foundation will be established to sell or facilitate the sale of vehicles owned by the U.S. Government employees enjoying duty-free privileges. The Embassy Automobile Board will administer the Foundation, establish the procedure for the sale of vehicles in accordance with the provisions of this instruction, and dispose of the funds received by the Foundation.

(2) Pending the legal establishment of a Foundation, the funds accruing to it from the sales of duty-free vehicles will be placed in escrow in an interest bearing account in a U.S. bank.

\* \* \* \* \* \*

This instruction also provided that any seller exercising either option 4 or 5, "must deal directly with the Foundation", and "must give the Foundation a quitclaim." Instruction 188 had to be revised and option 3 deleted due to the unwillingness of Brazilian Customs to permit the uncontrolled sale of automobiles after payment of import duties. It is unnecessary to comment on the further revisions because there were no material changes pertinent to this discussion. All of the plaintiffs herein elected either the sale-to or sale-through option and since there are no significant differences between the two we will no longer make a distinction.

Mr. Paul H. Goodman, an American citizen residing in Brazil, was hired as the "Administrative Officer" of the Foundation. Principally, it was his job to negotiate sales under options 4 and 5 with Brazilian buyers. When a sale was negotiated the seller received a "formula price". This price was found by our commissioner to be based, "not on the price shown on the sales invoice, but,

where the seller paid the U.S. excise tax, on the manufacturer's New York domestice list price, plus all accessories, and, where the seller did not pay the excise tax, on the New York FAS list price, plus accessories. Reimbursement also included all sales or title taxes paid in the United States; such costs as marine insurance, preparation charges, customs fees, port charges, and dock handling; and all inland and overseas transportation costs." The net effect of the transaction was that the employee, at the very least, had the use of a car in Brazil throughout his tour of duty absolutely without any cost for depreciation or obsolescence, though these as we all know, are major components of the cost of operating a motor vehicle at home.

Each plaintiff made application to sell his car on Embassy Form No. 1, which contained the following language just above the signature:

I hereby choose Option No. ———— of my own free will. \* \* \*.

I hereby renounce any claim against the U.S. Government, the Government of Brazil, the Embassy Automobile Board, or any person concerned with the implementation of the regulations governing the sale of my car, except in the case of fraud or malfeasance.

Upon receipt of his "formula" sale price, each plaintiff executed Embassy Form No. 3, which contained the following:

I accept voluntarily the above dollar amount in cash (or check No. ———) which I understand to be consonant with provisions of FAMC 281 issued by the Secretary of State and Embassy Instruction 188, issued by the Deputy Chief of Mission with the approval of the Ambassador, and do hereby release, renounce and quit claim now and forever all and any further claims against the United States Government, the Embassy of the United States of America at Rio de Janeiro and all or any person or organizations connected with this sale.

The commissioner stated that the conditions thus imposed upon duty-free sales, "that plaintiffs property be, without just compensation, appropriated for charitable purposes, was constitutionally improper." He then held that execution by plaintiffs of the required forms did not operate as a waiver or release because, "it is recognized in situations of this kind that agreements to accept the unconstitutional condition are executed under a form of duress."

The commissioner's conclusion presupposes that what plaintiffs surrendered was a constitutional right to make a duty-free sale. That simply is not the case here. As we said in *Finks*, 395 F.2d at 1003, 184 Ct.Cl. at 488, "Diplomatic personnel do not have a *right* to sell their vehicles duty-free, even if these conditions are fulfilled. Compliance with these time requirements will make a vehicle eligible for duty-free resale. Authorization for the sale is necessary before a resale qualifies. To obtain authorization, the Embassy must request permission from the Ministry. Both the Embassy and the Ministry might refuse to act."

It may be as plaintiffs contend that "defendant certainly was not legally free to act arbitrarily or capriciously in denying privileges to individuals who had met the established eligibility requirements." However, plaintiffs have not shown any arbitrary or capricious action on the part of the defendant. On the contrary, the record shows clearly that this action was taken only in pursuance of legitimate foreign policy goals and appeared reasonable under the circumstances.

It is not for this court to tell the Ambassador how to run his embassy. It is evident that many of us Americans have the urge to be entrepreneurs and it is well we do. Those who serve us abroad, though able and dedicated, are not *per se* entirely immune. It is evident that their possession and enjoyment of large quantities of luxury goods, brought to them tax and duty-free because of diplomatic immunities, in countries short of such articles but long on the love of them, makes for hazardous situations and perilous confrontations. The Ambassador has just as much the duty to enforce discipline in the premises, to keep anyone from making the danger greater, as if he were in command of a ship in a typhoon. He may make mistakes: few of us would always be right if in his shoes, but in doing what is clearly his duty he is not to be second-guessed or have to suffer this court's peering over his shoulder. Thus it is not a proper subject of our inquiry whether, as plaintiffs urge, the measures adopted really did the Brazilians no good, or whether the administrative details of the procedure (*e. g.*, as to tax liability) were properly worked out. "They cannot be characterized as unauthorized merely because they may have been mistaken, imprudent, or wrongful." *See*, Eyherabide v. United States, 345 F.2d 565, 570, 170 Ct.Cl. 598, 606 (1965).

From all the foregoing it is evident that the Ambassador had the right to regulate these sales and even prohibit them altogether if he thought it in the interest of better relations with Brazil to do so. Plaintiffs' counsel admitted as much in open court. Indeed, plaintiffs must urge and not deny this authority in the Ambassador or else they would not allege a cause of action under the Fifth Amendment. Royal Holland Lloyd v. United States, 73 Ct.Cl. 722, 732 (1932).

The defendant properly refers us to the cited case, which illustrates neatly the principles involved, as well as the willingness of our predecessors to draw fine distinctions. It came before us under a special jurisdictional act construed as authorizing an award under international law as well as under the Fifth Amendment. The facts were these: during this nation's participation in World War I, a Dutch merchant vessel put into New York in course of a voyage home from South America. The Collector of Customs prevented her departure for some six months by refusing a clearance. He did this primarily to maintain

her availability for requisitioning for U.S. war needs, but it was lawless, this court held, the duty to clear promptly on request a friendly foreign vessel for a lawful departure being mandatory. Eventually, the ship was formally requisitioned and proper compensation paid. The only issue was compensation for costs and losses to the owners during the previous period of detention. The possibility of back-dating the requisition is not mentioned and apparently was not urged or considered, so the problem as dealt with would not have been different if the vessel had been allowed to depart at the end of the six months. This court held that the utter lack of authority for the Collector's withholding clearance precluded liability of the United States under domestic law, but we made the owners an award under international law, wherein the obligation to pay just compensation was not dependent on the taking being lawful.

Plaintiffs' astute counsel is thus well aware of his dilemma, which is that for them to prevail, the Ambassador's action must be rightful and wrongful at the same time, and wrongful only in the particular of withholding just compensation lawfully due. Plaintiffs argue that the issue here is not the Ambassador's right to regulate or even prohibit a duty-free sale, but rather their alleged Fifth Amendment right to keep the entire fund resulting after such sales were properly authorized and consummated. But of course it is evident that the owner of property taken can agree with the taker on how he is to be compensated. We find that plaintiffs bargained away their compensation in excess of the amount agreed to in return for the privilege of making the sale at all. As noted above, the commissioner found that the plaintiffs assented to these conditions only under duress, because "as a practical matter there was no real choice because the cars were worth in the United States only a fraction of what they could obtain in Brazil even under the restricted formula price program." Thus the Ambassador's alleged wrong was in

making it financially more attractive for plaintiffs to do what he wanted them to than it would have been to do otherwise. This is not a case where plaintiffs' dilemma is the result of any real wrongdoing by the representatives of the Government. In Fruhauf Southwest Garment Co. v. United States, 111 F.Supp. 945, 951, 126 Ct.Cl. 51, 62 (1953), we noted, "It has become settled law that the mere stress of business conditions will not constitute duress where the defendant was not responsible for those circumstances." The question of coercion and duress by the Government has been presented to this court many times. In *Fruhauf*, 111 F.Supp. at 951, 126 Ct. Cl. at 62, we stated guidelines that have been frequently quoted in subsequent opinions. We think it appropriate to quote them again:

> The law of duress has broadened somewhat during recent years making it virtually impossible to arrive at any clear-cut definition, and the courts have stated that its application must of necessity depend upon the circumstances of each individual case. * *. An examination of the cases, however makes it clear that three elements are common to all situations where duress has been found to exist. These are: (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party. * * *. In order to substantiate the allegation of economic duress or business compulsion, the plaintiff must go beyond the mere showing of a reluctance to accept and of financial embarrassment. There must be a showing of acts on the part of the defendant which produced these two factors. The assertion of duress must be proven to have been the result of the defendant's conduct and not by the plaintiff's necessities. * * *

In Aircraft Associates & Mfg. Co. v. United States, 357 F.2d 373, 378, 174 Ct. Cl. 886, 896 (1966), although there find-

ing duress, we cited *Fruhauf, supra,* with approval and noted that, "if the Government's wrongful actions had not caused or contributed to plaintiff's financial difficulties, the exaction of a release from plaintiff under a threat to exercise the Government's contractual right would not vitiate the release on the ground of duress."

The *Fruhauf* standard is cited with approval more recently in Urban Plumbing and Heating Co. v. United States, 408 F.2d 382, 187 Ct.Cl. 15 (1969), where duress was found; and Inland Emp. Bldrs., Inc. v. United States, 424 F.2d 1370, 191 Ct.Cl. 742 (1970), where plaintiff's claim of duress was rejected. In *Urban Plumbing & Heating Co.,* Government caused delays of 69 days put plaintiff in mere technical default on a contract for modification of a heating and power plant in Alaska. The Government threatened a termination for default, which if done would have been wrongful. Alternatively it demanded that plaintiff choose between a 69 day extension without more, which was meaningless because winter conditions then prevented any work, or a 245 day extension with a stipulation that there would be no change in the contract price. We found that this waiver of a price increase was obtained under circumstances constituting coercion and duress. In *Inland Emp. Bldrs., Inc.,* plaintiffs had valid claims for additional compensation on a contract, but feared that any delays caused by presentation of such would subject them to substantial interest charges. Consequently, they executed unconditional releases when called upon to do so. They were held bound by the releases on a subsequent presentation of the claims. *Accord,* Adler Const. Co. v. United States, 423 F.2d 1362, 191 Ct. Cl. 607 (1970).

The Ambassador, in Embassy instruction 103, had made his authority in this matter quite plain. Plaintiffs never had any reason to believe that the policy expressed in that directive would not be enforced. With full knowledge that the Ambassador could require them to return their vehicles to the United States, plaintiffs brought them to Brazil, hopeful of a tidy profit. For reasons of policy it became necessary to eliminate or mitigate the image of profiteering. Rather than enforce his right to require exportation, the Ambassador offered to allow plaintiffs to sell their cars in Brazil at a reduced profit, in return for their release of claims. His stance was not wrongful. Plaintiffs accepted this offer and now they are bound by it. The compensation they agreed to take was not all they now say they want, but was far above confiscation and was no mere derisory figure. As to what plaintiffs' status might be had they chosen to export their cars and then bring this suit, we offer no comment.

■ In holding that plaintiffs' claim for just compensation has been settled and is not properly in litigation, we do not wish to be understood as holding that takings occurred. We pretermit that issue. *Quaere,* too, whether the taking if there was one was "for public use" in the Fifth Amendment terminology. *See* Finding 50. We hold that plaintiffs entered into an accord and satisfaction with the defendant, whereby all claims valid or invalid, for extra compensation, resulting from the duty-free sales of their automobiles at the "formula price", were effectively released. It follows that in this suit plaintiffs are not entitled to recover and the petition is dismissed.